NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 04a0115n.06
Filed: November 19, 2004

No. 03-1059

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| SHYTOUR WILLIAMS, | ) | |
| | ) | |
| Petitioner-Appellant, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED |
| | ) | STATES DISTRICT COURT FOR THE |
| KURT JONES, | ) | EASTERN DISTRICT OF MICHIGAN |
| | ) | |
| Respondent-Appellee. | ) | |

Before: DAUGHTREY, GIBBONS, and COOK, Circuit Judges.

JULIA SMITH GIBBONS, Circuit Judge. Petitioner-appellant Shytour Williams appeals

the district court's decision denying his petition for writ of habeas corpus. Williams was convicted

of first-degree murder, carjacking, conspiracy to commit first-degree murder, criminal sexual

conduct in the first degree, and possession of a firearm during the commission of a felony. He was

sentenced to mandatory life imprisonment for the murder conviction, concurrent life terms of

imprisonment for the carjacking and conspiracy convictions, and a mandatory consecutive two-year

term of imprisonment for the felony firearm conviction. The Michigan Court of Appeals affirmed

his conviction and Williams's delayed application for leave to appeal was later denied by the

Michigan Supreme Court. Williams then filed a petition for writ of habeas corpus, arguing that the

Michigan Court of Appeals' decision affirming his conviction was an unreasonable application of

United States Supreme Court precedent. The district court denied his petition, but certified the

following issues for appeal: (1) whether the trial court erred in admitting Williams's taped

confession to the police; (2) whether the trial court erred in admitting statements Williams made to

a juvenile detention youth specialist; and (3) whether Williams's constitutional right to confrontation

was violated when the trial court admitted an officer's testimony that Williams's co-defendant had

implicated him in the crimes. For the following reasons, we affirm the judgment of the district court.

**I.**

Petitioner was tried in connection with the kidnaping, sexual assault, robbery, and murder

of Karen King in Saginaw, Michigan, on January 3, 1997. Testimony at trial established that August

Williams ("August"), petitioner's co-defendant and cousin, forced King into her white Blazer as she

left a local store. Petitioner accompanied August and King as a passenger in the vehicle. Several

eyewitnesses testified that on that day they saw Williams and August driving a white Blazer with

a white female in the back. Courtney Noel stated that August opened the back door of the Blazer

to show him a white female with a mask or scarf over her face who was asking for help. Noel

identified petitioner as the driver of the vehicle and said that he had some kind of weapon or gun

pointed at the female. Sonja Armstrong and Kelly Barber testified that Williams and August came

to their house and showed them objects that had been taken from King's possession, including a CD

player, rings, and a cellular telephone that Williams identified as belonging to him.

Williams took the stand in his own defense and maintained that August pushed King into the

Blazer and then motioned for him to get inside. He denied that there had been any discussion about

robbing or hurting King prior to getting into the Blazer. After two blocks, Williams asked August

to let him out of the vehicle, but August refused. When August later stopped the vehicle, Williams told him, "Man, I ain't even in this." When Williams repeated his request to be let out of the vehicle, he said he "felt something" on the back of his neck, so he shut the door and started driving. Some time later, Williams pulled the vehicle over and saw King in the back seat with the seat belt around her throat. August had his knee on the back of her neck. He asked Williams to give him "about ten or fifteen minutes," after which Williams saw August drag King, who was then naked from the waist down, out of the vehicle. Williams denied choking, raping, or robbing King. Although he testified on direct that he took nothing from the Blazer, Williams later admitted on cross-examination that he told the police he had the cell phone from the robbery. King's pager was found on Williams at the time of his arrest.

The cause of King's death was ligature strangulation. Superficial stab wounds were found on her body, in addition to three separate tears in the anal area, which suggested penetration with some type of object. David Stephens, an employee of the Michigan State Police Crime Lab, testified that he found foot impressions made on the foot well of the Blazer that were consistent with footwear worn by Williams and a hair sample in the rear seat liner that was consistent with Williams's hair. A semen stain found on a back seat in the Blazer was consistent with a sample obtained from August. Williams was excluded as a possible contributor of the semen and bloodstains found inside the vehicle.

Two prior statements from Williams were admitted into evidence at trial over his objection. The first statement was his 50-minute tape-recorded confession to the police taken less than an hour and a half after his arrest at 5:15 p.m. on January 11, 1997. The second statement was made to a

juvenile detention youth specialist, Kenneth Mayo, some time after 7:00 a.m. the following morning. Williams challenged the admission of these statements at a suppression hearing prior to trial. He argued that, prior to the commencement of his tape-recorded statement, the police officers improperly denied his request to speak with an attorney or his parents in violation of *Miranda v. Arizona*, 384 U.S. 436 (1966). He also argued that his subsequent confession was involuntary due to the denial of his request for an attorney and to the fact that he was under the influence of marijuana at the time of his statement. The trial court rejected these arguments and found that Williams had the mental capability to understand his rights and that he voluntarily waived them by signing the waiver form and giving the police his statement. The court also found that petitioner had not made a request to speak with an attorney or with his parents prior to questioning and was not under the influence of marijuana at the time he made his statement to police. The court considered the length of the interrogation (one to one and a half hours), petitioner's level of education (ninth grade), and his physical condition at the time of his confession and concluded that it had been made knowingly and voluntarily. A transcript of petitioner's entire taped statement to the officers was admitted into evidence and played for the jury during his trial.

Prior to the admission of that statement, Sergeant Dewey Howie, one of the officers present during petitioner's interrogation, explained the circumstances leading up to Williams's confession:

> Q.      Now, Detective Sergeant Howie, would you indicate for us the dialogue that took place between you and the defendant as you sat down and introduced yourself?
> A.      Went in and introduced myself, [and] Detective Schneider; verified who he was by asking him his name, date of birth and such. Told him why I was there, about the death of Karen King. [Williams] [i]ndicated he would like to know how his name was brought in – into it, and he was told by his cousin August.
> Q.      And who told him that?

A.    By – I did, yes.

Q.    Okay.  And how did he – what was his response when you mentioned his cousin, August?

A.    A little surprised.

Q.    How did he express that surprise?

A.    He just said, "I'm not sure if I can believe that."  He was told that the conversation was taped, and he wanted to listen to it.

Q.    All right.  How did he express to you that he wanted to listen to the tape?

A.    To hear it, he asked.

Q.    He specifically said, "I want to hear that"?

A.    Yeah.

Q.    All right.  What did you do then?

A.    Detective Schneider went and obtained the tape and part of it was played for him . . . .

Q.    And was there a certain portion of that conversation that was played?

A.    Yes.

Q.    How much of it was played?

A.    Probably just over a minute or so.

Q.    All right.  And how long was the conversation? How long was the tape in its entirety?

A.    It's over an hour.

Q.    So you played approximately one minute of a much longer interview, is that correct?

A.    Yes, sir.

Q.    And during the course of the portion that you played, did August Williams' voice appear on the tape?

A.    Yes, sir.

Q.    Was there something that happened when August Williams' voice appeared on the tape?

A.    I asked him if he had – knew who that voice was, and he identified it as his cousin.

Q.    And what happened – did Shytour Williams react in any way when he heard that voice?

A.    Yes, he became excited and indicated that he wanted to talk.

At no point did petitioner object to this aspect of Sergeant Howie's testimony.  In fact, counsel for petitioner inquired further into the officers' decision to play a portion of August's earlier statement on cross-examination:

Q.    How many statements did August Williams give?
A.    Two.
Q.    Why did you play him the second statement rather than the first?
A.    That's the one that started out – that . . . implicated him.

The jurors also heard Kenneth Mayo's testimony that Williams had confessed to him the next morning from his cell in the juvenile detention center. At the suppression hearing, Mayo testified that he observed Williams rubbing his hands over his head and his face. When Mayo asked him, "What's up?" Williams replied, "They snitched on me, man. My cousin and my family snitched on me." Mayo asked Williams what he meant by that, and Williams said, "I could've got away, man. They snitched on me because, man, my cousin, man, he kept saying he wanted to get paid." Mayo again asked Williams what he was talking about, and he told Mayo that he had picked up a girl at a store with his cousin and that they had forced her into the car with a gun. He said they drove around with the girl in the back seat, harassing her and touching her. Mayo also testified that he heard Williams say, "We killed her man, we raped her after she was dead." On cross-examination, Mayo admitted that in an earlier statement he told police, "[Williams] said [he] was feeling all over her and you know just sexually harassing her. He said then . . . his cousin killed her and then raped her."

At the suppression hearing, Williams argued that Mayo's testimony was inadmissible because he had failed to advise Williams of his *Miranda* rights prior to conducting an in-custody interrogation. The trial court rejected this argument, finding that there was no police-initiated interrogation and therefore no need to give *Miranda* warnings. The court concluded that Mayo had not interrogated Williams for purposes of *Miranda* when he asked him, "What's up?" and that Mayo

was not a police officer and was not acting in concert with or at the direction of any law enforcement officer at the time of his conversation with Williams.

The jury convicted Williams of first-degree murder, conspiracy, carjacking, and possession of a firearm during the commission of a felony. The trial court sentenced Williams to life imprisonment without the possibility of parole on the first-degree murder conviction, concurrent terms of life imprisonment with the possibility of parole on the conspiracy and carjacking convictions, and a consecutive two-year term of imprisonment on the firearm conviction.

On appeal, Williams argued that the trial court erred by admitting his taped statement to the police and his statements to Mayo. He also argued that the trial court erred in admitting Sergeant Howie's testimony that August had implicated him in the crime. The Michigan Court of Appeals affirmed and Williams's delayed application for leave to appeal with the Michigan Supreme Court was denied. Williams then filed a petition for writ of habeas corpus, asserting the same three arguments and one additional argument not relevant for purposes of this appeal. The district court denied the petition, concluding that the decision of the Michigan Court of Appeals affirming Williams's conviction was neither contrary to nor an unreasonable application of clearly established Supreme Court precedent. The court granted Williams a certificate of appealability on the same three issues, *i.e.*, on whether the trial court erred in admitting (1) Williams's statements to the police, (2) Williams's confession to Mayo, and (3) Sergeant Howie's testimony referencing co-defendant August Williams's statement to the police.

**II.**

This court reviews a district court's legal conclusions in a habeas proceeding *de novo* and its factual findings for clear error. *Lucas v. O'Dea*, 179 F.3d 412, 416 (6th Cir. 1999). Because Williams's habeas petition was filed after April 24, 1996, this court's review is governed by the standards announced in the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"). AEDPA provides, in relevant part, that a federal court may not grant a petition for writ of habeas corpus unless the state court adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d).

In *Williams v. Taylor*, 529 U.S. 362, 413 (2000), the Supreme Court explained that a state court acts "contrary to" clearly established Supreme Court precedent when it "arrives at a conclusion opposite to that reached by this Court on a question of law," or when it "decides a case differently than this Court has on a set of materially indistinguishable facts." By contrast, a state court's decision involves an "unreasonable application" of clearly established federal law if it either (1) correctly identifies the governing legal principle from the Supreme Court's decisions but then unreasonably applies that principle to the facts of the prisoner's case, or (2) unreasonably extends, or unreasonably declines to extend, a clearly established legal principle to a new context. *Id.* at 412.

### A.      Williams's Taped Statement to Police Officers

Petitioner first argues that the district court erred in concluding that he voluntarily waived his *Miranda* rights and voluntarily confessed to the police.

"Statements made by a defendant in response to interrogation while in police custody are not

admissible unless the defendant has first been [apprised] of the constitutional right against self-incrimination and has validly waived his right." *United States v. Cole*, 315 F.3d 633, 636 (6th Cir. 2003) (citing *Miranda*, 384 U.S. at 478-79)). In determining whether a suspect who has received a *Miranda* warning has validly waived his rights, courts are instructed to consider the following factors:

> First, the relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception. Second, the waiver must have been made with full awareness both of the nature of the right being abandoned and the consequences of the decision to abandon it. Only if "the totality of the circumstances surrounding the investigation" reveal both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived.

*Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Whether a waiver is knowing and intelligent is determined by the particular facts and circumstances of the case, including the background, experience, and conduct of the accused." *Machacek v. Hofbauer*, 213 F.3d 947, 954 (6th Cir. 2000) (internal quotations omitted). The government bears the burden of proving the voluntariness of the waiver by a preponderance of the evidence. *United States v. Miggins*, 302 F.3d 384, 397 (6th Cir. 2002).

Williams argues that the record supports his claim that he failed to understand his *Miranda* rights. He focuses on his age (fifteen), education level (ninth grade), and inexperience with the police at the time of his arrest, and he reiterates his claim that he was high on marijuana at the time of his interrogation. He also points to the officers' failure to inform him that he was being treated as an adult. The Michigan Court of Appeals considered these same arguments and found that

petitioner was advised of his constitutional rights prior to custodial interrogation, that he understood those rights, and that he agreed to waive them. This determination was not contrary to or an unreasonable application of clearly established Supreme Court precedent. The court considered Williams's age, education level, and physical condition at the time of the interrogation. His *Miranda* rights were read to him as he followed along, and the officers explained his right to counsel to him when asked to do so. Whether a defendant understood his *Miranda* rights is a question of fact underlying the question of whether his waiver of those rights was knowing and intelligent. Thus, on federal habeas review, a federal court has to presume that the state court's factual finding that a defendant fully understood what was being said and asked of him was correct unless the petitioner shows otherwise by clear and convincing evidence. *See Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000). Williams has not provided any further evidence, clear and convincing or otherwise, to rebut the findings by the Michigan Court of Appeals that he understood the rights that were read to him. That court did not err in concluding that Williams knowingly, intelligently, and voluntarily waived his *Miranda* rights prior to giving his statement.

Williams also asserts the related claim that his subsequent confession to the police was involuntary. The Supreme Court has said that "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause of the Fourteenth Amendment." *Miller v. Fenton*, 474 U.S. 104, 109 (1985). In deciding whether a confession was voluntarily made, this court considers the following factors: "(1) the time between the defendant's arrest and arraignment; (2) whether the defendant knew the nature of the charged or suspected

offense; (3) whether the defendant was advised that he was not required to make any statements and that his statements could be used against him; (4) whether the defendant was advised of his right to the assistance of counsel before being questioned; and (5) whether the defendant was without the assistance of counsel when questioned." *United States v. Doe*, 226 F.3d 672, 679 (6th Cir. 2000). "In effect, the court considers the totality of the circumstances to evaluate whether a confession was voluntarily made." *Id.* A confession is involuntary only if there is police coercion or overreaching that overbore the accused's will and caused the confession. *Colorado v. Connelly*, 479 U.S. 157, 163-64 (1986).

Williams argues that the officers' refusal to allow his parents to be present and failure to advise him that he was being charged as an adult precluded him from fully understanding the consequences of his statements. Contrary to petitioner's contention, the Michigan Court of Appeals considered these arguments and other relevant factors in assessing the voluntariness of his confession. As the court noted, the absence of a juvenile defendant's parent does not *per se* render the defendant's confession involuntary because voluntariness depends upon the totality of the circumstances. *See Doe*, 226 F.3d at 679-80. In assessing the totality of the circumstances surrounding petitioner's confession, the court of appeals found that he "was questioned only once" and that "the entire process, from arrival at the police station to completion of the statement, took only two and a half hours. There was no evidence that [Williams] was not in good health and he admitted that he was not mistreated." At the suppression hearing, the trial court specifically found that Williams was treated "courteously" by the officers. Petitioner knew the nature of the charge or suspected offense because the officers told him they wanted to speak to him about "the murder

of Karen King." He was informed of his right to remain silent and of his right to an attorney. In short, the court of appeals identified the appropriate standard for assessing the voluntariness of petitioner's confession and did not apply that standard in an unreasonable way.

**B.      Williams's Statement to the Juvenile Detention Officer**

Williams next argues that the court of appeals erred in concluding that *Miranda* warnings were not required before Mayo asked the petitioner, "What's up?" and "What do you mean by that?"

*Miranda* warnings are required when police question a suspect in a custodial interrogation. *United States v. Bowers*, 739 F.2d 1050, 1055 (6th Cir. 1984). "Custodial interrogation means questioning initiated by law enforcement officers after a person has been taken into custody." *Illinois v. Perkins*, 496 U.S. 292, 296 (1990) (internal quotations omitted). Interrogation, for purposes of *Miranda*, refers to express questioning and to any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from the suspect. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). When deciding whether a suspect has been interrogated, courts should "carefully scrutinize the factual setting of each encounter." *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983). "Even a relatively innocuous series of questions may, in light of the factual circumstances and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response." *Id.* However, "[a]ny statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." *Id.* (citing *Miranda*, 384 U.S. at 478).

The parties do not dispute that Williams was in custody for purposes of *Miranda* at the time

of his statement to Mayo, but disagree as to whether Mayo's conduct amounted to police-initiated interrogation. The Michigan Court of Appeals concluded, and the district court agreed, that *Miranda* warnings were not required before Mayo began his conversation with petitioner because Mayo was not a police officer, nor was he working with or at the request of the police. In reaching this decision, the court relied on *People v. Anderson*, 531 N.W.2d 780, 785 (Mich. Ct. App. 1995), which held that a juvenile probation officer was not a police officer for purposes of *Miranda* because (1) she did not wear a badge, carry any type of weapon, or wear a uniform, (2) her duties did not include the interrogation of criminal suspects, and (3) she did not have the authority to arrest or detain anyone.

The mere fact of imprisonment does not mean that all of a prisoner's conversations are official interrogations that must be preceded by *Miranda*. *United States v. Willoughby*, 860 F.2d 15, 23 (2d Cir. 1988). Rather,

> [f]idelity to the doctrine announced in *Miranda* requires that it be enforced strictly, [and] only in those types of situations in which the concerns that empowered the decision are implicated. Thus, [this court] must decide whether a [given curtailment of freedom of action] exerts upon a detained person pressures that sufficiently impair his free exercise of his privilege against self-incrimination to require that he be warned of his constitutional rights.

*Berkemer v. McCarty*, 468 U.S. 420, 437 (1984).

We do not need to reach the question whether Mayo's questions amounted to interrogation for purposes of *Miranda* because we agree with the district court and the Michigan Court of Appeals that *Miranda* warnings were not required. Mayo is not a police officer, he does not wear a uniform or a badge, and he does not carry any type of weapon. His duties do not include the interrogation

of criminal suspects. *Miranda* was concerned with the danger of coercion resulting from the interaction of custody and official interrogation. *Perkins*, 496 U.S. at 297. *Miranda* warnings are not required any time a suspect is in custody in a technical sense and converses with someone who happens to be a government agent. *Id.* The court of appeals thus did not err in concluding that Williams's statement to Mayo was admissible.

### C.    Testimony Concerning Out-of-Court Statements Made by August Williams

Finally, petitioner argues that Sergeant Howie's testimony at trial that August had "brought [petitioner's name] into it" violated his Sixth Amendment right to confront the witnesses against him.

The Sixth Amendment's Confrontation Clause provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. Const. amend. VI. A non-testifying co-defendant's statements that implicate a defendant are presumptively unreliable and their admission violates the Confrontation Clause unless the statement bears adequate "indicia of reliability." *Ohio v. Roberts*, 448 U.S. 56, 63-66 (1980); *Douglas v. Alabama*, 380 U.S. 415 (1965).

Williams argues that the trial court erred in allowing Sergeant Howie to refer to August's statement to the police while the officer was testifying about the circumstances leading up to Williams's confession. In making this argument, petitioner relies on the Supreme Court's decision in *Bruton v. United States*, 391 U.S. 123 (1968), in which the Court held that one defendant in a joint trial was denied his Sixth Amendment right of confrontation due to the admission into evidence of

his co-defendant's confession that implicated both of them in the crime. The Michigan Court of Appeals held that it was not error for the trial court to have admitted Howie's testimony because (1) Williams and August were not tried together; (2) August's statement itself was not admitted into evidence; and (3) the jury was not advised that August had actually implicated petitioner in the crimes. The district court agreed with this analysis.

Insofar as the decisions of the Michigan Court of Appeals and the district court suggest that any Confrontation Clause issues can be solved by separate trials, they are contrary to clearly established Supreme Court precedent. A criminal defendant may make a motion to have his trial separated from that of his co-defendant in order to minimize the potential that his non-testifying co-defendant's statements implicating him in the crime will be admitted into evidence against him. Separation of the trials does not automatically cure all Confrontation Clause issues; it merely makes it less likely such issues will arise in the first place. A non-testifying co-defendant who has invoked his privilege against self-incrimination is just as unavailable to testify when he is tried with another co-defendant as when he is not. The Supreme Court has repeatedly found Confrontation Clause issues to exist in cases where the defendants were tried separately. *See, e.g.*, *Douglas*, 380 U.S. at 419.

However, neither the Michigan Court of Appeals nor the district court rested its decision solely on the fact that the petitioner and August Williams were tried separately. Both courts also noted that August's statement was not admitted into evidence and the jury was not advised that August had actually implicated him in the crime. Petitioner vigorously disputes the latter point and argues that the jury was informed that August had implicated him. Sergeant Howie did in fact

testify that August's statement to the police had implicated Williams in the crime, but we note that this testimony was in response to a question asked by Williams's own counsel. Moreover, even if the admission of this testimony violated Williams's constitutional rights, a constitutional error that implicates trial procedures must be considered harmless unless it had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In light of the fact that August's statement was not itself admitted into evidence and considering the substantial amount of additional evidence of Williams's guilt introduced at trial – including his 50-minute taped confession to police, eyewitness statements that they had seen him driving the white Blazer and putting a gun to the victim's head, and eyewitness testimony that he was walking around with the victim's cell phone shortly after the crime – we cannot say that this brief reference to statements made by his co-defendant had a substantial or injurious effect or influence in determining the jury's verdict. Any error in admitting this portion of Sergeant Howie's testimony was therefore harmless.

**III.**

For the foregoing reasons, we affirm the judgment of the district court.