*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 08a0409p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

VAN CHESTER THOMPKINS, JR.,
　　　　　　　　*Petitioner-Appellant,*

　　　*v.*

No. 06-2435

MARY BERGHUIS, Warden,
　　　　　　　　*Respondent-Appellee.*

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 05-70188—Patrick J. Duggan, District Judge.

Argued: February 1, 2008

Decided and Filed: November 19, 2008

Before: MOORE, CLAY, and ROGERS, Circuit Judges.

---

## COUNSEL

**ARGUED:** Elizabeth L. Jacobs, LAW OFFICE, Detroit, Michigan, for Appellant. Janet A. VanCleve, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee. **ON BRIEF:** Elizabeth L. Jacobs, LAW OFFICE, Detroit, Michigan, for Appellant. Brad H. Beaver, OFFICE OF THE MICHIGAN ATTORNEY GENERAL, Lansing, Michigan, for Appellee.

---

## OPINION

---

　　　KAREN NELSON MOORE, Circuit Judge. Petitioner-Appellant Van Chester Thompkins, Jr. ("Thompkins") appeals the district court's denial of his petition for a writ of habeas corpus. Following a jury trial in 2002 in Michigan state court, Thompkins was convicted of first-degree murder, assault with intent to commit murder, and several firearms-related charges. After exhausting the state appeals process, Thompkins filed in the United States District Court for the Eastern District of Michigan a petition for a writ of habeas corpus, which the district court denied. The district court certified three claims for appeal: (1) whether Thompkins's confession was obtained in violation of the Fifth Amendment when the police officers questioned Thompkins for nearly three hours, the officers described the interview as "very, very one-sided," and the officers described Thompkins as "not verbally communicative" and as having "shared very limited verbal responses" while "[l]argely . . . remain[ing] silent"; (2) whether Thompkins's right to due process was violated when the prosecution offered evidence of accomplice-witness Eric Purifoy's jury

1

verdict and guilty plea conviction on charges stemming out of the same incident giving rise to Thompkins's charges; and (3) whether Thompkins was denied effective assistance of counsel when his counsel failed to request that the trial court instruct the jury that it could consider the evidence relating to the jury verdict and guilty-plea conviction of accomplice-witness Purifoy only in evaluating Purifoy's credibility and not as substantive evidence of Thompkins's guilt.

For the reasons discussed below, we **AFFIRM** the district court's denial of Thompkins's petition for a writ of habeas corpus as to his claim of prosecutorial misconduct, but we **REVERSE** the judgment of the district court denying relief as to his Fifth Amendment and ineffective-assistance-of-counsel claims and **REMAND** the case with instructions that the district court order that Thompkins be released from state custody unless the State of Michigan commences a new trial within 180 days of the final federal-court judgment in this case.

## I. BACKGROUND

On January 10, 2000, a shooting occurred around 9:00 p.m. in a strip mall parking lot in Southfield, Michigan. Samuel Morris ("Morris") died from multiple gunshot wounds, while his friend Frederick France ("France") survived despite being shot several times. At Thompkins's trial, France testified that he and Morris were driving through the mall parking lot when a group of several men walked in front of their car and began staring at them. Joint Appendix ("J.A.") at 264-65 (Trial Tr. 5/13/2002 at 197-98). France testified that he and Morris got out of their car and that France and Thompkins exchanged words as Thompkins and the others in his group approached a white and blue van. J.A. at 270-73 (Trial Tr. 5/13/2002 at 204-07). Morris and France reentered their car and began driving away, but the van soon pulled up alongside them so that the passenger-side window of the van was adjacent to the driver-side window of Morris and France's car. J.A. at 273-81 (Trial Tr. 5/13/2002 at 207-215). France testified that he had no doubt that Thompkins was seated in the passenger seat of the van and that Thompkins said "What you say, Big Dog" immediately before drawing a gun and firing several shots into Morris and France's car. J.A. at 280-81 (Trial Tr. 5/13/2002 at 214-15). The next day, while France was in the hospital, two police officers showed him a photograph taken by a security camera inside Lou's Deli, a store at the mall where the shooting occurred, and France identified three individuals as being respectively the shooter, the driver, and another passenger in the van. J.A. at 287-89 (Trial Tr. 5/13/2002 at 230, 232, 237). France identified Thompkins as the shooter. J.A. at 288 (Trial Tr. 5/13/2002 at 232).

The police focused their investigation into the shooting on three men, Thompkins, Eric Purifoy ("Purifoy"), and Myzell Woodward ("Woodward"). Woodward, who contacted the police shortly after the incident, apparently was never charged. Pet'r Br. at 6. Purifoy turned himself in to the police, and he was tried in August 2000 on the same charges as would later be brought against Thompkins. J.A. at 289 (Trial Tr. 5/13/2002 at 237); J.A. at 345-47 (Trial Tr. 5/16/2002 at 85-87). Purifoy was acquitted of the murder and assault charges, convicted of carrying a concealed weapon, and after his trial Purifoy pleaded guilty to three further firearm-related counts. J.A. at 345-47 (Trial Tr. 5/16/2002 at 85-87).

Thompkins was not found until over a year after the shooting when he was arrested along with three other men near Columbus, Ohio, on February 19, 2001. J.A. at 319-20, 331-32 (Trial Tr. 5/16/2002 at 35-36, 55-56). Thompkins attempted to escape while the officers were handcuffing the others and, when recaptured, gave the officers various false pieces of identification and insisted that his name was Detniuan Isiah Reed. J.A. at 324-25, 328-29 (Trial Tr. 5/16/2002 at 42-43, 52-53). When Thompkins was fingerprinted at the Franklin County (Ohio) jail, the results revealed his true identity as Van Chester Thompkins, Jr. J.A. at 331-32 (Trial Tr. 5/16/2002 at 55-56).

On February 22, 2001, Detective Christopher Helgert ("Helgert") from the Southfield (Michigan) Police Department interrogated Thompkins at the jail in Ohio. J.A. at 149 (Op. & Order

Denying Mot. to Suppress at 1). At a hearing in October 2001 regarding Thompkins's motion to suppress statements that he made during the February 2001 interrogation, Helgert testified that he and his partner interviewed Thompkins for approximately three hours. J.A. at 213-14 (Supp. Hr'g Tr. at 78-79). Helgert read Thompkins a form that advised him of his *Miranda* rights and got Thompkins to confirm orally his understanding of those rights, but Thompkins refused to sign the form acknowledging that the officers had read him his rights. J.A. at 214-15, 220-23 (Supp. Hr'g Tr. at 79-80, 85-88). Helgert described the interview as "very, very one-sided," J.A. at 217 (Supp. Hr'g Tr. at 82), and as "nearly a monologue," J.A. at 227 (Supp. Hr'g Tr. at 92). Helgert described Thompkins as "so uncommunicative," J.A. at 217 (Supp. Hr'g Tr. at 82), as "not verbally communicative," J.A. at 227 (Supp. Hr'g Tr. at 92), and remarked that "[l]argely, he remained silent," J.A. at 229 (Supp. Hr'g Tr. at 94). Helgert also stated that "Mr. Thompkins shared very limited verbal responses with us," J.A. at 217 (Supp. Hr'g Tr. at 82), and that Thompkins "talk[ed] with us very sporadically," J.A. at 216 (Supp. Hr'g Tr. at 81). Asked whether Thompkins had "consistently exercised his right to remain substantively silent for at least two hours and forty-five (45) minutes," Helgert replied "Yes, that's right." J.A. at 232 (Supp. Hr'g Tr. at 97). On re-direct, Helgert stated that occasionally Thompkins gave both verbal and non-verbal responses to the questions and that he understood Thompkins's "eye contact," "a nod of the head," and "look[ing] up" as engaging in limited conversation. J.A. at 236-37 (Supp. Hr'g Tr. at 101-02). Helgert also testified that "I don't know" was a "quite prevalent" response to his questions, as well that "[s]ometimes [Thompkins's response] would be a word or two. A 'yeah,' or a 'no,' or 'I don't know.'" J.A. at 233, 236 (Supp. Hr'g Tr. at 98, 101).

After two hours and forty-five minutes of the "very, very one-sided" interview, Helgert "tried to take a different tac[k], I guess what I call a spiritual tac[k]," and he asked Thompkins "whether or not he believed in God." J.A. at 217 (Supp. Hr'g Tr. at 82). Helgert testified that Thompkins

> made eye-contact with me for one of the few times that he did for the interview. I saw his eyes well up with tears. He answered me orally and said, "Yes."
>     I asked if he had prayed to God? And he said "Yes."
>     And I asked him if he had asked God to forgive him for—I believe the words were, and I quoted them in my report verbatim "shooting that boy down." And he answered, "Yes."

J.A. at 218 (Supp. Hr'g Tr. at 83). Helgert testified that Thompkins "refuse[d] to write anything," that Thompkins "wouldn't touch the pen or paper that my partner placed in front of him," and that shortly after this exchange the interview was terminated. J.A. at 218-19 (Supp. Hr'g Tr. at 83-84). On May 10, 2002, the Michigan state court denied Thompkins's motion to suppress his statements, reasoning that Thompkins "never invoked his right to remain silent, and participated in the interview by making eye contact, nodding, and answering questions with, 'I don't know.'" J.A. at 152 (Order Denying Mot. to Suppress at 4).

On May 13, 2002, Thompkins's trial began before a jury in the Oakland County Circuit Court, and Thompkins states that "[t]he defense theory was that Eric Purifoy was the shooter and that [Thompkins] was merely present." Pet'r Br. at 7. The prosecution presented the testimony of several witnesses who saw or heard parts of the altercation and shooting in the mall parking lot. *See* Resp't Br. at 6-8. France testified about the interactions leading up to the shooting; he also testified about identifying Thompkins as the shooter and Purifoy as the driver after seeing photographs of them the day after the shooting when France was in the hospital. J.A. at 287-88 (Trial Tr. 5/13/2002 at 231-32). The prosecution also asked France about what he knew about Purifoy's trial, and France responded that Purifoy "got charged, but he got found not guilty on having anything to do with this," with the prosecution confirming that "this" involved "[t]he murder." J.A. at 289 (Trial Tr. 5/13/2002 at 237). On cross-examination, France stated that at some point police officers had presented him

with a photo-lineup in which he picked out a person other than Thompkins. J.A. at 295-97 (Trial Tr. 5/14/2002 at 48-50).

The prosecution offered the testimony of Omar Stephens ("Omar"),[1] who stated that he and Thompkins were friends and that he had a sister named Tamika. J.A. at 307-11 (Trial Tr. 5/16/2002 at 5-9). Omar stated that he and Tamika had a phone conversation with Thompkins approximately one month after the shooting, after Omar saw Thompkins's picture on television. J.A. at 308-10 (Trial Tr. 5/16/2002 at 6-8). Omar testified that Thompkins explained that the shooting victims "got into it" and that "[h]e just told . . . me he had to pop them up." J.A. at 311 (Trial Tr. 5/16/2002 at 9). Omar also testified that around the time of the shooting Thompkins had been driving a van matching the description of the van used in the shooting. J.A. at 312-13 (Trial Tr. 5/16/2002 at 10-11).

The prosecution called Purifoy as a witness, but he initially refused to testify, stating that he had "been advised to take the Fifth Amendment Right as far as anything concerning January 10th." J.A. at 343 (Trial Tr. 5/16/2002 at 73). After conferring with his attorney, Purifoy changed his mind and later decided to testify. J.A. at 375-76 (Trial Tr. 5/16/2002 at 153-54).[2] Purifoy stated that on January 10, 2000, Thompkins drove Purifoy and Woodward to the mall and Lou's Deli. J.A. at 379-82 (Trial Tr. 5/16/2002 at 160, 164-66). Because Thompkins was unfamiliar with the area, Purifoy gave him directions and, after the group finished eating, Purifoy claimed that he took the keys to Thompkins's van for the return drive because they "had some problems getting there." *Id.* at 382. Purifoy also described the shooting, stating that Thompkins was in the passenger seat when Purifoy pulled the van alongside Morris and France's car but that when Purifoy heard shots, he and Thompkins ducked down. J.A. at 383-91 (Trial Tr. 5/16/2002 at 167-71, 174-77). Purifoy testified that after the shots were fired he looked up and saw a gun in Thompkins's hand. J.A. at 390-91 (Trial Tr. 5/16/2002 at 176-77). The prosecution requested that the court take judicial notice that Purifoy had not received immunity for his testimony. J.A. at 401-02 (Trial Tr. 5/16/2002 at 188-89). The prosecution introduced letters written by Purifoy to Thompkins and read aloud a portion of one letter referring to Myzell Woodward, the third person in the van on the night of the shooting. The prosecution stated to Purifoy that "[y]ou know that he [Woodward] has been—he is being looked at with respect to a murder in Ohio, where he faces potentially the death penalty." J.A. at 405 (Trial Tr. 5/16/2002 at 215). The prosecution asked Purifoy about what happened at his own trial regarding these events, and Purifoy replied that "I was acquitted of the Murder charge and found guilty on Weapons Charges." J.A. at 401 (Trial Tr. 5/16/2002 at 188).

The prosecution presented the testimony of Detective Helgert, eliciting testimony from Helgert regarding the outcome of Purifoy's jury trial in which he was acquitted on murder charges arising out the same events underlying the charges in this trial. J.A. at 345-47 (Trial Tr. 5/16/2002 at 85-87). Helgert also stated that Purifoy "was charged under the theory that he was an Aider and Abettor." J.A. at 346 (Trial Tr. 5/16/2002 at 86). Helgert then testified about the interrogation of Thompkins that took place in Ohio in February 2001. J.A. at 355-66 (Trial Tr. 5/16/2002 at 100-11).

---

[1] The record contains some uncertainty as to whether Omar's last name is Stephens or Allen. J.A. at 426-27 (Trial Tr. 5/17/2002 at 83-84) (witness referring to "Omar Allen"); *see also* J.A. at 156-61 (Affidavits of Kenneth Lee and Omar Allen) (asserting that Omar's last name is Allen and that "[h]is testimony in court that Thompkins had confessed to him was a total lie").

[2] Prior to Purifoy's testimony, the prosecution moved to exclude several letters that Purifoy wrote to Thompkins, arguing that the defense had produced them only the preceding day. J.A. at 179 (Fed. Dist. Ct. Op. & Order Denying Habeas Pet. at 6). In response, the defense claimed that it had not decided whether to introduce the letters and had received them only the night before the trial. *Id.* The parties ultimately resolved the matter off-the-record and the prosecution decided to enter the letters into evidence; after Purifoy testified, the trial judge read a prepared statement to the jury. *See* J.A. at 179, 194-95 (Op. at 6, 21-22).

He testified that "[m]y partner and I did most of the talking in that interview," J.A. at 359 (Trial Tr. 5/16/2002 at 104), and that Thompkins "spent a lot of his time sitting . . . simply holding his head looking down," J.A. at 364 (Trial Tr. 5/16/2002 at 109). Helgert stated that "I remember two things that he did say, he said 'He didn't want a peppermint' that my partner offered him and 'the chair that he was sitting in was hard.'" *Id.* Helgert explained that his interrogation tactics included "using the ostrich head in the sand metaphor. 'How do you think this is going to turn out for you?' 'You need to help yourself, you need to put forth an explanation.' 'People are going to want to hear from you.'" J.A. at 360-61 (Trial Tr. 5/16/2002 at 105-06). Helgert testified that "[n]one of that generated any significant response," that it "wasn't productive," and that the questions did not elicit "any admissions or denials, for that matter, it didn't really illicit [sic] any sort of reaction." J.A. at 361, 363 (Trial Tr. 5/16/2002 at 106, 108).

Helgert stated that "there were several times I had to direct his attention back to me to make eye contact with me." J.A. at 363-64 (Trial Tr. 5/16/2002 at 108-09). Describing his questions near the end of the three-hour interview, Helgert recalled that "[t]he last theme I employed" was his "spiritual tac[k]," in which he "appeal[ed] to somebody's sense of morality or religion." J.A. at 364-65 (Trial Tr. 5/16/2002 at 109-10); J.A. at 217 (Supp. Hr'g Tr. at 82). This theme elicited several answers of "Yes" from Thompkins to questions about whether Thompkins believed in God, prayed, and had prayed for forgiveness for "shooting that boy down." J.A. at 365 (Trial Tr. 5/16/2002 at 110). Helgert stated that his partner placed a tablet of paper and a pen in front of Thompkins, but Thompkins "never touched" them. J.A. at 365-66 (Trial Tr. 5/16/2002 at 110-11).

Two Southfield police officers testified for the defense, Stacey Vida ("Vida") and Keith Wing ("Wing"). Vida testified that when she interviewed France at the hospital he told her that the shooter was a light-skinned black male.[3] J.A. at 417 (Trial Tr. 5/17/2002 at 20). Wing also testified that France described the shooter as light-skinned. J.A. at 419, 421 (Trial Tr. 5/17/2002 at 46, 60). The defense presented testimony from Tamika Stephens, who denied that she was related to Omar Stephens/Allen and stated that she had been Thompkins's girlfriend for six years. J.A. at 425-26 (Trial Tr. 5/17/2002 at 82-83). Tamika testified that Omar did not have any telephone conversations with Thompkins in her presence. J.A. at 427-28 (Trial Tr. 5/17/2002 at 84-85). Finally, Tamika and Thompkins's cousin Lakeisha Mallory testified that Thompkins is left-handed. J.A. at 430, 434 (Trial Tr. 5/17/2002 at 87, 107). France, the surviving victim of the shooting, had earlier testified that the shooter used his right hand to pull the trigger. J.A. at 293 (Trial Tr. 5/14/2002 at 25).

When the case was submitted to the jury, the court did not give an instruction informing the jury that it could use the evidence regarding the result of co-defendant Purifoy's jury trial only to assess Purifoy's credibility, but Thompkins's counsel did not request such an instruction or object to its absence. The jury convicted Thompkins on all charges, and Thompkins appealed to the Michigan Court of Appeals, which affirmed his convictions in February 2004. J.A. at 163-67 (Mich. Ct. App. Op.). The Michigan Court of Appeals held that "the record does not demonstrate that defendant asserted his right to remain silent" and that because Thompkins "continued to talk with the officer, albeit sporadically . . . [t]he trial court did not clearly err in concluding that defendant voluntarily waived his right to remain silent and that he did not subsequently invoke his right to silence." J.A. at 163-64 (Op. at 1-2). The court noted that plain-error review applied to Thompkins's claims of prosecutorial misconduct regarding the references to the jury verdict in Purifoy's trial because Thompkins's counsel failed to object contemporaneously, and the court held that any errors that may have occurred did not result in prejudice warranting reversal. J.A. at 164-65 (Op. at 2-3). The court rejected Thompkins's claim of ineffective assistance because it found no prejudice. J.A. at 165-66 (Op. at 3-4). In particular, the court observed that "[a]lthough the [trial] court did not specifically instruct the jury that it could consider Purifoy's conviction only for

---

[3] Thompkins has a "'[d]ark brown' complexion." J.A. at 294 (Trial Tr. 5/14/2002 at 27).

purposes of his credibility, the record does not disclose an attempt to argue that conviction for an improper purpose." J.A. at 166 (Op. at 4). In July 2004, the Michigan Supreme Court denied Thompkins's application for leave to appeal the judgment of the Michigan Court of Appeals. J.A. 168 (Mich. Sup. Ct. Order).

In January 2005, Thompkins filed a petition for a writ of habeas corpus in the U.S. District Court for the Eastern District of Michigan. J.A. at 4-75 (Petition for Writ of Habeas Corpus & Brief in Support). The district court denied Thompkins's petition in September 2006. J.A. at 174-206 (U.S. Dist. Ct. Op. & Order Denying Habeas Pet.). Thompkins filed a Notice of Appeal in October 2006, J.A. at 208 (Notice of Appeal), and the district court granted a partial certificate of appealability as to the three issues summarized above. J.A. at 457-59 (Order Granting COA).

## II. ANALYSIS

### A. Standard of Review

Thompkins seeks relief pursuant to 28 U.S.C. § 2254, which, as amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) ("AEDPA"), provides that

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1)  resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2)  resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. § 2254(d)(1)-(2).

The Supreme Court has explained that "[a] state-court decision will certainly be contrary to our clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases." *Terry Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state-court decision is also "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Id.* at 412-13. A state court's decision is an "unreasonable application" of clearly established federal law "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 413. "[C]learly established law under [AEDPA] encompasses more than just bright-line rules laid down by the [Supreme] Court. It also clearly includes legal principles and standards enunciated in the Court's decisions." *Taylor v. Withrow*, 288 F.3d 846, 850-51 (6th Cir.), *cert. denied*, 537 U.S. 1007 (2002). "The lack of an explicit statement" of a rule "is not determinative" because "[t]he Court has made clear that its relevant precedents include not only bright-line rules but also the legal principles and standards flowing from precedent." *Id.* at 852; *see also Panetti v. Quarterman*, 127 S. Ct. 2842, 2858 (2007) ("AEDPA does not 'require state and federal courts to wait for some nearly identical factual pattern before a legal rule must be applied.'") (quotation omitted).

We review the district court's legal conclusions de novo and its factual findings for clear error. *Moss v. Hofbauer*, 286 F.3d 851, 858 (6th Cir.), *cert. denied*, 537 U.S. 1092 (2002). We review the state court's determination of mixed questions of fact and law under the "unreasonable application" prong. *Barnes v. Elo*, 339 F.3d 496, 501 (6th Cir. 2003), *cert. denied*, 540 U.S. 1164

(2004). AEDPA "establish[es] a presumption that a state court's determination of a factual issue is correct, and mandat[es] that '[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.'" *Moss*, 286 F.3d at 858-59 (quoting 28 U.S.C. § 2254(e)(1)). "In applying AEDPA, we look to the last state-court decision on the merits, which in this case is the decision of the [Michigan] Court of Appeals." *Garcia v. Andrews*, 488 F.3d 370, 374 (6th Cir.), *cert. denied*, 128 S. Ct. 493 (2007).

## B. Thompkins's Fifth Amendment Claim

Thompkins argues that the introduction at his trial of the statements that he made near the end of the three-hour long interrogation session conducted by Detective Helgert violated the Fifth Amendment. Thompkins contends that he had effectively invoked his right to remain silent by being—in the words that Helgert used at the hearing on Thompkins's Motion to Suppress—"so uncommunicative," J.A. at 217 (Supp. Hr'g Tr. at 82), "not verbally communicative," J.A. at 227 (Supp. Hr'g Tr. at 92), and by "[l]argely . . . remain[ing] silent," J.A. at 229 (Supp. Hr'g Tr. at 94). Further, when Thompkins's attorney asked Helgert whether Thompkins "had consistently exercised his right to remain substantively silent for at least two hours and forty-five (45) minutes," Helgert replied "Yes, that's right." J.A. at 232 (Supp. Hr'g Tr. at 97).

The district court denied Thompkins's Fifth Amendment claim because it found that the Michigan state court—which held that Thompkins did not "assert[] his right to remain silent" because "he continued to talk with the officer, albeit sporadically" such that Thompkins "voluntarily waived his right to remain silent," J.A. at 163-64 (Mich. Ct. App. Op. at 1-2)—did not unreasonably apply clearly established federal law as determined by the Supreme Court or base its decision on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. J.A. 202-03 (Op. at 29-30). Noting that "[t]he prosecution has the burden of establishing a knowing and intelligent waiver of the rights," Thompkins argues that "[t]he prosecution did not meet its heavy burden in proving a valid waiver of the right" to remain silent given Detective Helgert's repeated descriptions of Thompkins as silent and uncommunicative and Helgert's inability to identify answers to specific questions that Thompkins made in the first two hours and forty-five minutes of the interview. Pet'r Br. at 15, 22, 21. Thompkins thus contends that the state court's decision involved both an "unreasonable application of clearly established federal law" and "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceedings." Pet'r Br. at 22 (citing § 2254(d)(2)).

We agree with Thompkins and reverse the district court's denial of his petition because the state-court's decision involved both "an unreasonable application of[] clearly established Federal law" and "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2).

### 1. Clearly Established Federal Law Regarding Waiver and Invocation of a Suspect's Right to Remain Silent

In *Miranda v. Arizona*, 384 U.S. 436, 475 (1966), the Supreme Court held that "a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination." The Supreme Court has explained that "[t]he critical safeguard" provided by the *Miranda* warnings is the knowledge of "a person's 'right to cut off questioning.'" *Michigan v. Mosley*, 423 U.S. 96, 103 (1975) (quoting *Miranda*, 384 U.S. at 474). Therefore, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.'" *Id.* at 103-04 (quoting *Miranda*, 384 U.S. at 474, 479).

In determining whether a suspect has waived her *Miranda* rights, the Supreme Court has held that that "[t]he courts must presume that a defendant did *not* waive his rights; *the prosecution's burden is great*." *North Carolina v. Butler*, 441 U.S. 369, 373 (1979) (emphases added). Further, "a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained." *Miranda*, 384 U.S. at 475. In *Butler*, the Supreme Court re-affirmed its holding in *Carnley v. Cochran*, 369 U.S. 506, 516 (1962), that "[p]resuming waiver from a silent record is impermissible," but the Court did state in *Butler* that "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." *Butler*, 441 U.S. at 373 & n.4. The Court in *Butler* quoted two crucial passages from its opinion in *Miranda*, observing that in *Miranda*

> this Court said: "If the interrogation continues without the presence of an attorney and a statement is taken, a *heavy burden* rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel."
> The Court's opinion went on to say: "An express statement that the individual is willing to make a statement and does not want an attorney followed closely by a statement could constitute a waiver. *But a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.*"
> Thus, the Court held that an express statement can constitute a waiver, and that silence alone after such warnings cannot do so. But the Court did not hold that such an express statement is indispensable to a finding of waiver.

*Butler*, 441 U.S. at 372-73 (quoting *Miranda*, 384 U.S. at 475) (internal citations omitted) (emphases added). The Court's *Miranda* opinion emphasized that "[t]he requirement of warnings and waiver of rights is [] fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation." *Miranda*, 384 U.S. at 476. Finally, the Supreme Court has cautioned that "[i]nvocation and waiver are entirely distinct inquiries, and the two must not be blurred by merging them together." *Smith v. Illinois*, 469 U.S. 91, 98 (1984).

In terms of a suspect's invocation of her right to remain silent, in *Miranda* the Supreme Court held that "[i]f the individual *indicates in any manner*, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease." *Miranda*, 384 U.S. at 473-74 (emphasis added). Although the Supreme Court has not addressed what conduct or statements suffice to "indicate[] in any manner" one's intent to invoke the right to remain silent, the Supreme Court has explained the standard governing the invocation of one's right *to counsel*. In *Davis v. United States*, 512 U.S. 452, 455 (1994), the Supreme Court noted that the suspect "waived his rights to remain silent and to counsel, both orally and in writing." Approximately an hour and a half into the interview, the suspect stated that "'[m]aybe I should talk to a lawyer.'" *Id.* at 455. After the investigating agents sought clarification as to whether the suspect wanted a lawyer, the suspect said "'No, I don't want a lawyer.'" *Id.* Rejecting the defendant's argument that his statement that "[m]aybe I should talk to a lawyer" effectively invoked his right to counsel such that the interrogation should have ceased and his statements been suppressed, the Supreme Court held that to invoke one's right to counsel "the suspect must unambiguously request counsel" because the Court's "precedents do not require the cessation of questioning" "if a suspect makes a reference to an attorney that is ambiguous or equivocal." *Id.* at 459. The Court specifically restated its holding as establishing "that, *after a knowing and voluntary waiver* of the *Miranda* rights, law enforcement officers may *continue* questioning until and unless the suspect clearly requests an attorney." *Id.* at 461 (emphases added).

In terms of our review of the distinct waiver and invocation inquiries, "[a]lthough the ultimate question of whether [the suspect's] waiver was knowing and intelligent is subject to review

under the standards set forth in section 2254(d), any subsidiary factual findings made by the state court are entitled to a presumption of correctness under section 2254(e)." *Valdez v. Ward*, 219 F.3d 1222, 1231 (10th Cir. 2000) (internal citation omitted); *see also Williams v. Jones*, 117 F. App'x 406, 412 (6th Cir. 2004) (unpublished) (citing *Valdez*); *United States v. Rodriguez*, 518 F.3d 1072, 1076 (9th Cir. 2008) ("This court reviews a trial court's legal conclusions on *Miranda* waivers de novo, and findings of fact underlying those conclusions for clear error."); *United States v. Carter*, 489 F.3d 528, 534 (2d Cir. 2007) ("We review a district court's determination regarding the constitutionality of a *Miranda* waiver *de novo* and a district court's underlying factual findings for clear error."). In the invocation "context, we review the district court's factual findings concerning the words a defendant used to invoke his *Miranda* rights for clear error and whether the words actually invoked those rights de novo." *Rodriguez*, 518 F.3d at 1076.

In denying Thompkins's petition, the district court quoted a First Circuit case that "'concluded that *Davis* applies to both components of *Miranda*: the right to counsel and the right to remain silent'" and accordingly analyzed the record to determine whether Thompkins "clearly and unequivocally invoked his right to remain silent after Helgert advised him of his *Miranda* rights." J.A. at 201-02 (Op. at 28-29) (quoting *Bui v. DiPaola*, 170 F.3d 232, 239 (1st Cir. 1999)).[4]

## 2. The Michigan State Courts' Adjudication of Thompkins's Fifth Amendment Claim

In denying Thompkins's motion to suppress, the Michigan trial court rejected Thompkins's argument that his silence and general uncooperativeness during the three-hour long interview were "repeated implicit invocations of his right to silence" and instead found that "[t]he defendant never invoked his right to remain silent." J.A. at 151-52 (Order Denying Mot. to Suppress at 3-4). As to the initial issue of whether Thompkins waived his rights, the trial court observed that the officers advised Thompkins of his rights, but that he refused to sign the form. The trial court concluded that Thompkins "knowingly and intelligently waived his rights" because he "never invoked his right to remain silent, and participated in the interview by making eye contact, nodding, and answering questions with, 'I don't know.'" *Id.* at 152.

The Michigan Court of Appeals affirmed, and the entirety of its analysis regarding Thompkins's Fifth Amendment claim is quoted below:

> Defendant argues that the trial court erred by denying his motion to suppress his statements to the police. Defendant asserts that the police improperly continued to interrogate him after he "implicitly" invoked his right to remain silent by failing to answer the officers' questions. We disagree.
> The record discloses that defendant was advised of his *Miranda* rights and, according to the interrogating officer, verbally acknowledged that he understood those rights. Contrary to defendant's argument, the record does not demonstrate that defendant asserted his right to remain silent. Although defendant refused to sign the advice of rights form, he continued to talk with the officer, albeit sporadically. He answered questions with brief responses, or by nodding his head, but never said he did not want to talk or that he was not going to say anything. "When a defendant speaks after receiving *Miranda* warnings, a momentary pause or even a failure to answer a question will not be construed as an affirmative invocation by the defendant

---

[4] Thompkins contends that lower courts are in conflict regarding whether the *Davis* "unambiguous request" standard for invoking the right to counsel affects the analysis of whether an individual has invoked the right to remain silent. Pet'r Br. at 18-22. Because the resolution of this issue is not critical to the outcome in this case—that is, we conclude that the prosecution failed to meet its "heavy burden" in first showing that Thompkins *waived* his *Miranda* rights—we need not address Thompkins's arguments that the *Davis* standard does not apply to invoking the right to remain silent.

of a right to remain silent." The trial court did not clearly err in concluding that defendant voluntarily waived his right to remain silent and that he did not subsequently invoke his right to silence. Defendant's statements were properly admitted into evidence.

J.A. 163-64 (Mich. Ct. App. Op. at 1-2) (footnote and citations to Michigan case law omitted).

The state court's adjudication of Thompkins's Fifth Amendment claim both involved an unreasonable determination of the facts in light of the evidence presented and also unreasonably applied clearly established federal law. That is, the state court's analysis failed to pay proper heed to the Supreme Court's holding that "[t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great." *Butler*, 441 U.S. at 373; *see also Miranda*, 384 U.S. at 475 ("[A] heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination."). Furthermore, the record contradicts the finding that Thompkins "continued to talk with the officer, albeit sporadically." We consider the factual determination first, as it underlies the legal determinations.

The Michigan Court of Appeals's finding that Thompkins "continued to talk with the officer, albeit sporadically" lacks support in the record. Certainly, Helgert at one point testified that Thompkins "talk[ed] with us very sporadically," J.A. at 216 (Supp. Hr'g Tr. at 81), but Helgert identified essentially *no* specific statements that Thompkins made. At the suppression hearing, Helgert testified that during the first two hours and forty-five minutes of the interrogation Helgert was "just repeating that theme [and b]eing really quite repetitious in the monologue, 'This is your opportunity to talk. What do you think is going to happen? Who is going to speak up for you if you don't speak up for yourself?'" J.A. 233 (Supp. Hr'g Tr. at 98). When the prosecution asked Helgert how Thompkins responded to this monologue, Helgert offered vague testimony that "sometimes [Thompkins's response] would be eye-contact, sometimes it would be a nod of the head, sometimes, I know the words, 'I don't know' was quite prevalent," while also admitting that Thompkins "sat there and listened to our speech, if you will, most of the time." J.A. at 233, 234 (Supp. Hr'g Tr. at 98, 99). Helgert *never* identified any specific question or questions to which Thompkins made his "responses" of eye-contact, head nods, or use of the phrase "I don't know." Indeed, Helgert even admitted that when he tried his "spiritual tac[k]" near the end of the interrogation, Thompkins then "made eye-contact with me *for one of the few times* that he did for the interview." J.A. at 218 (Supp. Hr'g Tr. at 83) (emphasis added). Helgert's testimony thus demonstrates that Thompkins rarely even made eye contact with the officers. At trial, Helgert stated that "I remember two things that he did say, he said 'He didn't want a peppermint' that my partner offered him and 'the chair that he was sitting in was hard.'" J.A. at 364 (Trial Tr. 5/16/2002 at 109).

Given that the above constituted the total of Thompkins's responses to the first two hours and forty-five minutes of the interrogation, the Michigan Court of Appeals's finding that Thompkins "talk[ed] with the officer, albeit sporadically" simply misrepresents the record. Rather, Helgert's testimony demonstrates that the interrogation was "very, very one-sided," J.A. at 217 (Supp. Hr'g Tr. at 82), "nearly a monologue," J.A. at 227 (Supp. Hr'g Tr. at 92), and that Thompkins was "uncommunicative," J.A. at 217 (Supp. Hr'g Tr. at 82), and "not verbally communicative," J.A. at 227 (Supp. Hr'g Tr. at 92). Most revealingly, *three times* Thompkins's counsel asked Helgert variations of a question regarding whether Thompkins remained silent during the first two-plus hours of the interrogation, and each time Helgert confirmed that Thompkins had done so. *See* J.A. at 229, 231, 232 (Supp. Hr'g Tr. at 94, 96, 97).[5] Contrary to the state court's statement, the evidence

_____

[5] Specifically, the first question asked Helgert whether "consistently . . . for two hours and fifteen (15) minutes every time you gave [Thompkins] an opportunity to participate meaningfully in the conversation he exercised his right to remain silent," and Helgert replied that "[l]argely he remained silent, that's correct." J.A. at 229 (Supp. Hr'g Tr. at 94). The second question asked Helgert whether Thompkins "exercised [his right to remain silent] continuously for two

demonstrates that Thompkins was silent for two hours and forty-five minutes. Indeed, the only evidence of Thompkins's participation consists of his declining a peppermint, complaining about his chair, and occasionally nodding his head or responding "I don't know" to *unidentified* questions, and these actions do not amount even to "sporadic" conversation with the officers. To disregard a state court's factual determination, "the state court's factual determination must be 'objectively unreasonable' in light of the evidence presented during the state proceedings," and this is such a case. *Dennis v. Mitchell*, 354 F.3d 511, 518 (6th Cir. 2003).

The state court also unreasonably applied clearly established federal law insofar as the court viewed such scant evidence of Thompkins's participation during the interrogation as demonstrating that Thompkins voluntarily waived his right to remain silent given the Supreme Court's command that "[t]he courts must presume that a defendant did not waive his rights; the prosecution's burden is great." *Butler*, 441 U.S. at 373; *see also Miranda*, 384 U.S. at 475 (stating that a "heavy burden rests on the government" to prove waiver). Helgert's vague testimony regarding Thompkins's "responses" during the interrogation—responses consisting of eye contact, head nods, declining a peppermint, complaining about his chair, and occasional statements of "I don't know"—does not suffice to meet the state's "great" burden of showing that Thompkins waived his right to remain silent. The Supreme Court's opinion in *Miranda* specifically addressed this *precise* issue: "[A] *valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained*." *Miranda*, 384 U.S. at 475 (emphasis added); *see also United States v. Upton*, 512 F.3d 394, 399 (7th Cir. 2008) ("Waiver can never occur through 'mere silence,' as the *Miranda* warnings themselves indicate.") (citing *Butler*, 441 U.S. at 373). In addition, Thompkins refused to sign even the *advice* of rights form, which purports only to show a suspect's acknowledgment that officers had read the rights and not that the suspect was waiving the rights. The Supreme Court's opinion in *Butler* clearly permits implied waivers of *Miranda* rights, but a suspect's uncooperativeness or refusal to sign even an advice of rights form certainly has relevance to determining whether Thompkins waived his rights. *Butler*, 441 U.S. at 374 ("[T]he question of waiver must be determined on 'the particular facts and circumstances surrounding th[e] case, including the background, experience, and conduct of the accused.'") (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)).

Had Helgert identified any particular exchange involving an instance of eye contact or a head nod, the issue of whether the prosecution had satisfied its "heavy burden" of showing "a course of conduct indicating waiver" would be entirely different. Helgert described his questioning as similar to a "monologue" propounding on the "theme" that this was Thompkins's opportunity to tell his side of the story. Crucially, Helgert described Thompkins's conduct throughout the first two and half hours of the interview as generally "shar[ing] very limited verbal responses with us," J.A. at 217 (Supp. Hr'g Tr. at 82), as "remain[ing] silent," J.A. at 229 (Supp. Hr'g Tr. at 94), and as "not very cooperative or responding," J.A. at 228 (Supp. Hr'g Tr. at 93). Helgert described Thompkins's "limited" conduct of making a "nod of the head" or a "'yeah,' or a 'no,' or 'I don't know'" without providing *any* context. J.A. at 236-37 (Supp. Hr'g Tr. at 101-02). Had Helgert testified that Thompkins nodded his head in response to a question asking whether Thompkins wanted his side of the story to be known, such testimony would obviously be powerful evidence of waiver; a head nod in response to a question asking whether Thompkins was comfortable declining to exercise his opportunity to tell his side of the story (or a "no" to a question about whether Thompkins wished to tell his story) would present an entirely different situation. Without the context of Thompkins's occasional eye contact or head nods, we cannot say that Thompkins's conduct indicated a waiver

---

hours and forty-five (45) minutes in terms of substantive responses to your attempts to elicit statements regarding his offense, is that fair to say?," and Helgert responded "[m]uch of the time. Most of the time, yes." J.A. at 231 (Supp. Hr'g Tr. at 96). Finally, the third question inquired whether Thompkins's statements responding to Helgert's "spiritual tac[k]" of questioning came "after [Thompkins] had consistently exercised his right to remain substantively silent for at least two hours and forty-five (45) minutes?," and Helgert answered "Yes, that's right." J.A. at 232 (Supp. Hr'g Tr. at 97).

of his rights; to the contrary, refusing to sign even an advice of rights form, being "so uncommunicative," J.A. at 217 (Supp. Hr'g Tr. at 82), "remain[ing] silent," J.A. at 229 (Supp. Hr'g Tr. at 94), and "spen[ding] a lot of his time sitting . . . simply holding his head looking down," J.A. at 364 (Trial Tr. 5/16/2002 at 109), form a course of conduct that powerfully suggests Thompkins did *not* waive his rights.

Thompkins's conduct also contrasts markedly to the behavior of defendants in cases where courts have found implied waivers. For instance, in *United States v. Upton*, 512 F.3d 394, 399 (7th Cir. 2008), the Seventh Circuit found that the defendant "impliedly waived his *Miranda* rights before he confessed" even though "he did not sign an acknowledgment form" because the defendant "freely talk[ed] about the allegations against him, admitting they were true but attempting to strike a deal." The Seventh Circuit also stated that "[w]aiver can *never* occur through 'mere silence,' as the *Miranda* warnings themselves indicate." *Id.* Similarly, in *United States v. Younger*, 398 F.3d 1179, 1186 (9th Cir. 2005), the Ninth Circuit affirmed a district court's finding of "an implied waiver . . . based on evidence that after Officer Hall advised defendant of his *Miranda* rights but before questioning him, defendant made a spontaneous statement and responded to further questioning without reference to counsel." In *Burket v. Angelone*, 208 F.3d 172, 198 (4th Cir. 2000), the Fourth Circuit denied a certificate of appealability in a case in which the Virginia Supreme Court found an implied waiver given that the defendant "initiated a conversation" with the detective and "stated that he understood his rights and wanted to talk to" the detective.

The case presenting perhaps the starkest contrast is *Bui v. DiPaola*, 170 F.3d 232, 239 (1st Cir. 1999), the First Circuit case that the district court cited. In *Bui*, the First Circuit observed that courts "routinely" conclude that defendants have impliedly waived their rights in cases in which the "incriminating statements were made either as part of a 'steady stream' of speech or as part of a back-and-forth conversation with the police." *Bui*, 170 F.3d at 240 (internal citations omitted). The First Circuit concluded that the petitioner's interview "fit the implied waiver profile" because the record showed "a fairly standard two-way conversation with the authorities" in which the petitioner's conduct even included a "continuation of the conversation," asking the officers "'who said I did this'" when the officers inquired "whether he had something to say about the reasons for his arrest" in response to the petitioner's "boast[] that the police had nothing" on him. *Id.* at 240-41. The account of Helgert's interview with Thompkins bears no resemblance to the clear evidence in *Bui* of a back-and-forth conversation between the petitioner and the authorities, which included specific questions and answers. Indeed, the evidence in *Bui* demonstrated that the petitioner even *asked* questions; in contrast, as Helgert testified at trial, Thompkins "spent a lot of his time sitting . . . simply holding his head looking down," J.A. at 364 (Trial Tr. 5/16/2002 at 109). Helgert described the interview as "nearly a monologue," J.A. at 227 (Supp. Hr'g Tr. at 92), and as "very, very one-sided," J.A. at 217 (Supp. Hr'g Tr. at 82), an account that clearly establishes the interview was *not* "a fairly standard two-way conversation." *Bui*, 170 F.3d at 241.

As a result, we conclude that Thompkins did not waive his rights, and the Michigan Court of Appeals unreasonably applied clearly established federal law, namely *Miranda* itself and *Butler*, in concluding otherwise. The state failed to satisfy its "heavy burden" of showing that Thompkins's "course of conduct indicat[ed] waiver." *Butler*, 441 U.S. at 373. Indeed, Thompkins's persistent silence for nearly three hours in response to questioning and repeated invitations to tell his side of the story offered a clear and unequivocal message to the officers: Thompkins did not wish to waive his rights. *See United States v. Wallace*, 848 F.2d 1464, 1475 (9th Cir. 1988) (concluding that the defendant "did not waive her rights" when, "[i]n the face of repeated questioning by Agent Brehm, Wallace maintained her silence for several minutes and, perhaps, as many as ten minutes.").

In sum, we hold that the district court erred in denying Thompkins's petition for a writ of habeas corpus because the Michigan Court of Appeals's rejection of his Fifth Amendment claim "was based on an unreasonable determination of the facts in light of the evidence" and "involved

an unreasonable application of[] clearly established Federal law." § 2254(d). Because we conclude that the Michigan Court of Appeals unreasonably applied clearly established federal law in determining that Thompkins *waived* his right to remain silent, we do not need to resolve whether the state court further unreasonably applied clearly established federal law in determining that Thompkins failed to *invoke* his right to remain silent by in fact remaining substantively silent for nearly three hours.

## C. Thompkins's Prosecutorial Misconduct Claim

Thompkins argues that various instances of prosecutorial misconduct violated his Due Process Clause right to a fair trial. Pet'r Br. at 23-34. Thompkins's claim of prosecutorial misconduct centers upon the prosecution's offering "evidence of Purifoy's jury verdict and guilty plea conviction and of the aider and abettor charge against Purifoy." J.A. at 459 (Order Granting Certificate of Appealability at 3).

The warden argues that Thompkins has procedurally defaulted this claim because he failed to object contemporaneously to the instances of prosecutorial misconduct and the Michigan Court of Appeals reviewed this claim for plain error. Resp't Br. at 25 (citing *Gulertekin v. Tinnelman-Cooper*, 340 F.3d 415, 423-34 (6th Cir. 2003); *see also Seymour v. Walker*, 224 F.3d 542, 557 (6th Cir. 2000) (noting that "[c]ontrolling precedent in our circuit indicates that plain error review does not constitute a waiver of state procedural default rules"). The warden further notes that Thompkins's appellate brief failed to argue for the existence of cause and prejudice to excuse his procedural default. Resp't Br. at 25. In his Reply Brief, Thompkins did include a brief section asserting that his arguments relating to his ineffective-assistance-of-counsel claim sufficiently demonstrated cause and prejudice for the failure to preserve his claim of prosecutorial misconduct. Pet'r Reply Br. at 2-3.

In ruling on Thompkins's prosecutorial-misconduct claim, the district court noted the warden's argument that the claim was procedurally defaulted but elected to consider the merits "[g]iven that the cause and prejudice inquiry for the procedural default issue merges with an analysis of the merits of [Thompkins's] ineffective assistance of counsel claim." J.A. at 184 (Op. at 11 n.3). Although Thompkins's failure to set forth an explicit argument regarding cause and prejudice until his Reply Brief is troubling in light of this clear notice that the warden had already asserted that his prosecutorial-misconduct claim was procedurally defaulted, we follow the district court in considering the merits of Thompkins's prosecutorial-misconduct claim given the overlapping analysis. We also conclude that Thompkins is not entitled to relief on this claim.

### 1. Clearly Established Federal Law Regarding Prosecutorial Misconduct

"On habeas review, [t]he relevant question is whether the prosecutor's comments so infected the trial with unfairness as to make the conviction a denial of due process." *Bates v. Bell*, 402 F.3d 635, 640-41 (6th Cir. 2005) (quotation omitted). Therefore, "to obtain relief, [Thompkins] must demonstrate that the prosecution's conduct was both improper and so flagrant as to warrant reversal." *Id.* at 641. We consider four factors "in determining whether the challenged conduct is flagrant: (1) the likelihood that the remarks of the prosecutor tended to mislead the jury or prejudice the defendant; (2) whether the remarks were isolated or extensive; (3) whether the remarks were deliberately or accidentally made; and (4) the total strength of the evidence against the defendant." *Id.* Finally, "[c]laims of prosecutorial misconduct are reviewed deferentially on habeas review." *Millender v. Adams*, 376 F.3d 520, 528 (6th Cir. 2004).

### 2. The State Court's Adjudication of Thompkins's Prosecutorial-Misconduct Claim

The Michigan Court of Appeals applied plain-error review to Thompkins's claim of prosecutorial misconduct because of his failure to lodge contemporaneous objections. J.A. at 164-65

(Mich. Ct. App. Op. at 2-3). The state court recognized that it was "improper for the prosecution to introduce evidence of codefendant Purifoy's conviction," but it concluded that Thompkins's "substantial rights were not affected because the defense asserted that Purifoy was the shooter and that the evidence of Purifoy's conviction [on firearm charges] linked Purifoy to the gun." J.A. at 164 (Op. at 2). As a result, the court of appeals apparently believed that the evidence that Purifoy had been convicted of possessing a firearm on that date would bolster Thompkins's attempts to pin the murder on Purifoy, despite the evidence that Purifoy's jury had acquitted him of the murder charges.

The district court agreed with the state court that "[t]he testimony regarding the outcome of Purifoy's trial was improper and should not have been admitted." J.A. at 186 (Op. at 13). However, the district court noted that "if the defendant's accomplice testifies at trial, evidence of the accomplice's convictions may be introduced so the jury can assess his credibility," so long as the trial court instructs the jury "that it may not consider the accomplice's conviction as evidence of the defendant's guilt." J.A. at 186-87 (Op. at 13-14). Even though Purifoy testified and the trial court failed to give the jury such a cautionary instruction, the district court denied Thompkins's prosecutorial-misconduct claim because it did not believe that the introduction of such evidence rendered the entire trial fundamentally unfair. *Id.*

We agree with the district court's analysis and affirm the denial of Thompkins's prosecutorial-misconduct claim on this ground. The true cause for concern is not necessarily that the prosecutor elicited such evidence of an accomplice's conviction—as the district court noted, evidence of an accomplice's conviction *is* admissible to evaluate the witness's credibility—but rather the failure of the trial court to instruct the jury on the proper use of the evidence (and the failure of defense counsel to request such an instruction). It was not wholly illegitimate and improper for the prosecution to introduce evidence of Purifoy's convictions, and the error that occurred from this introduction stemmed not from the *prosecutor's* actions but instead from the failure of Thompkins's counsel to request, and the trial court's failure to give, a cautionary instruction to the jury. That is, although an error or misconduct occurred, the parties responsible for that error are Thompkins's attorney and the trial judge, not the prosecutor. Accordingly, Thompkins's claim of prosecutorial misconduct lacks merit.

## D. Thompkins's Ineffective-Assistance-of-Counsel Claim

Thompkins argues that he received ineffective assistance of counsel because his attorney failed to request that the trial court instruct the jury that it could consider the evidence of Purifoy's jury trial and guilty pleas only in assessing Purifoy's credibility and not as substantive evidence of Thompkins's guilt. Pet'r Br. at 36. We conclude that the district court erred in denying Thompkins's ineffective-assistance-of-counsel claim and that Thompkins is entitled to habeas relief on this ground as well.

### 1. Clearly Established Federal Law Regarding Ineffective Assistance of Counsel

The standard for establishing ineffective assistance of counsel requires that a defendant (1) "show that counsel's representation fell below an objective standard of reasonableness" and (2) that a defendant show prejudice, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington*, 466 U.S. 668, 688, 694 (1984). Further, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

## 2. The State Court's Adjudication of Thompkins's Ineffective-Assistance-of-Counsel Claim

That Thompkins has satisfied the first prong of his ineffectiveness claim—deficient performance—is clear. Although the warden contends that "failure to ask for [a limiting] instruction was sound trial strategy," Resp't Br. at 30, the Michigan Court of Appeals appeared to accept that counsel's failure to request a limiting instruction was error and simply denied Thompkins ineffectiveness claim because it found a lack of prejudice because "the record does not disclose an attempt to argue [Purifoy's] conviction for an improper purpose," that is, for a purpose other than an effect on Purifoy's credibility. J.A. at 166 (Mich. Ct. App. Op. at 4). Likewise, the district court agreed with Thompkins "that effective counsel would have requested such [a limiting] instruction." J.A. at 197 (Op. at 24). Indeed, the failure to request such a limiting instruction is particularly deficient in light of Thompkins's primary defense at trial, which was "that Eric Purifoy was the shooter and that defendant was merely present." Pet'r Br. at 7. The district court noted Thompkins's argument that "he was extraordinarily prejudiced by the introduction of this testimony [relating to Purifoy's trial and convictions] because his defense was that Purifoy was the shooter. As [Thompkins] raises: '[i]f Purifoy's jury found him not guilty who did that leave as the shooter?'" J.A. at 185 (Op. at 12).

We hold that Thompkins has satisfied the second prong of his ineffectiveness claim as well. Although the district court found that the performance of Thompkins's counsel was deficient, the court denied Thompkins's claim because "the Court [did] not believe that the introduction of evidence regarding Purifoy's convictions rendered [Thompkins's] trial fundamentally unfair." J.A. at 197 (Op. at 24). Rendering the trial "fundamentally unfair," however, is not the standard used to evaluate a claim of ineffective assistance; under *Strickland*, the required showing is prejudice, measured as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* Given that Thompkins's *central strategy* at trial involved pinning the blame on Purifoy, that his jury heard evidence—from *multiple* witnesses, J.A. at 345-47 (Trial Tr. 5/16/2002 at 85-87) (Helgert); J.A. at 289 (Trial Tr. 5/13/2002 at 237) (France); J.A. at 401 (Trial Tr. 5/16/2002 at 188) (Purifoy)—that Purifoy had been acquitted of murder likely exerted a powerful influence on the jury to convict Thompkins of murder. If the jury did not convict Thompkins, the jury knew that no one would be convicted for killing Morris and shooting France. Most importantly, in the absence of a limiting instruction, the jury could well have believed that it was entirely proper to weigh Purifoy's acquittal as significant evidence that Thompkins must have been the shooter. In fact, the trial court's jury instructions included the statement that "[y]ou may convict the defendant *based only on the accomplice's testimony*, if you believe the testimony and it proves the Defendant's guilty beyond a reasonable doubt." J.A. at 443 (Trial Tr. 5/17/2002 at 166) (emphasis added). The jury thus heard that it could convict Thompkins based solely on Purifoy's testimony, which included not only his account of the shooting but also his statement that he had been acquitted of murder.

Although we have concluded that the district court erred in denying Thompkins's ineffective-assistance-of-counsel claim, on habeas review Thompkins of course bears the additional burden of "show[ing] that the [Michigan] Court of Appeals applied *Strickland* to the facts of his case in an objectively unreasonable manner." *Bell v. Cone*, 535 U.S. 685, 699 (2002). We hold that Thompkins has satisfied this burden as well.

The Michigan Court of Appeals applied *Strickland* in an objectively unreasonable manner in this case because its analysis of prejudice was fundamentally flawed. The Michigan Court of Appeals appeared to acknowledge that Thompkins's counsel erred and was deficient in failing to request a limiting jury instruction regarding the evidence of Purifoy's trial verdicts, but it rejected Thompkins's claim because "the record does not disclose an attempt to argue [regarding Purifoy's]

conviction for an improper purpose." J.A. at 166 (Mich. Ct. App. Op. at 4). Questions of the prosecution's purpose or intent are completely irrelevant in an analyzing whether an error resulted in prejudice, which by definition concerns the error's effect upon the *outcome*. *Strickland*, 466 U.S. at 696 ("[A] court making the prejudice inquiry must ask if the defendant has met the burden of showing that the *decision reached* would reasonably likely have been different absent the errors.") (emphasis added). Even if the prosecution intended that the evidence regarding Purifoy's jury trial outcome be considered only as it pertained to Purifoy's credibility, the prosecutor's intent does not cure the problem that a reasonable probability exists that the jury understood Purifoy's acquittal as powerful evidence that Thompkins, the only other individual in the front seat of the van, must have been the shooter.

In denying Thompkins's ineffective-assistance claim on the ground that the prosecution did not introduce evidence relating to Purifoy's jury trial "for an improper purpose," the Michigan Court of Appeals applied the prejudice prong of the *Strickland* analysis in an objectively unreasonable manner. We therefore conclude that Thompkins is entitled to relief on his claim of ineffective assistance of counsel.

## III. CONCLUSION

For the reasons discussed above, we **AFFIRM** the district court's denial of Thompkins's petition for a writ of habeas corpus as to his claim of prosecutorial misconduct, but we **REVERSE** the judgment of the district court denying relief as to his Fifth Amendment and ineffective-assistance-of-counsel claims and **REMAND** the case with instructions that the district court order that Thompkins be released from state custody unless the State of Michigan commences a new trial within 180 days of the final federal-court judgment in this case.