Justice Kennedy
delivered the opinion of the Court.
The United States Court of Appeals for the Sixth Circuit, in a habeas corpus proceeding challenging a Michigan conviction for first-degree murder and certain other offenses, ruled that there had been two separate constitutional errors in the trial that led to the jury's guilty verdict. First, the Court *374 of Appeals determined that a statement by the accused, relied on at trial by the prosecution, had been elicited in violation of Miranda v. Arizona, 384 U. S. 436 (1966). Second, it found that failure to ask for an instruction relating to testimony from an accomplice was ineffective assistance by defense counsel. See Strickland v. Washington, 466 U. S. 668 (1984). Both of these contentions had been rejected in Michigan courts and in the habeas corpus proceedings before the United States District Court. Certiorari was granted to review the decision by the Court of Appeals on both points. The warden of a Michigan correctional facility is the petitioner here, and Van Chester Thompkins, who was convicted, is the respondent.
I
A
On January 10, 2000, a shooting occurred outside a mall in Southfield, Michigan. Among the victims was Samuel Morris, who died from multiple gunshot wounds. The other victim, Frederick France, recovered from his injuries and later testified. Thompkins, who was a suspect, fled. About one year later he was found in Ohio and arrested there.
Two Southfield police officers traveled to Ohio to interrogate Thompkins, then awaiting transfer to Michigan. The interrogation began around 1:30 p.m. and lasted about three hours. The interrogation was conducted in a room that was 8 by 10 feet, and Thompkins sat in a chair that resembled a school desk (it had an arm on it that swings around to provide a surface to write on). App. 144a-145a. At the beginning of the interrogation, one of the officers, Detective Hel-gert, presented Thompkins with a form derived from the Miranda rule. It stated:
"NOTIFICATION OF CONSTITUTIONAL RIGHTS AND STATEMENT
"1. You have the right to remain silent.
*375 “2. Anything you say can and will be used against you in a court of law.
“3. You have a right to talk to a lawyer before answering any questions and you have the right to have a lawyer present with you while you are answering any questions.
“4. If you cannot afford to hire a lawyer, one will be appointed to represent you before any questioning, if you wish one.
“5. You have the right to decide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned.” Brief for Petitioner 60 (some capitalization omitted).
Helgert asked Thompkins to read the fifth warning out loud. App. 8a. Thompkins complied. Helgert later said this was to ensure that Thompkins could read, and Helgert concluded that Thompkins understood English. Id., at 9a. Helgert then read the other four Miranda warnings out loud and asked Thompkins to sign the form to demonstrate that he understood his rights. App. 8a-9a. Thompkins declined to sign the form. The record contains conflicting evidence about whether Thompkins then verbally confirmed that he understood the rights listed on the form. Compare id., at 9a (at a suppression hearing, Helgert testified that Thompkins verbally confirmed that he understood his rights), with id., at 148a (at trial, Helgert stated, “I don’t know that I orally asked him” whether Thompkins understood his rights).
Officers began an interrogation. At no point during the interrogation did Thompkins say that he wanted to remain silent, that he did not want to talk with the police, or that he wanted an attorney. Id., at 10a. Thompkins was “[ljargely” silent during the interrogation, which lasted about three hours. Id., at 19a. He did give a few limited verbal responses, however, such as “yeah,” “no,” or “I don’t know.” And on occasion he communicated by nodding his *376 head. Id., at 23a. Thompkins also said that he “didn’t want a peppermint” that was offered to him by the police and that the chair he was “sitting in was hard.” Id., at 152a.
About 2 hours and 45 minutes into the interrogation, Hel-gert asked Thompkins, “Do you believe in God?” Id., at 11a, 153a. Thompkins made eye contact with Helgert and said “Yes,” as his eyes “well[ed] up with tears.” Id., at 11a. Helgert asked, “Do you pray to God?” Thompkins said “Yes.” Id., at 11a, 153a. Helgert asked, “Do you pray to God to forgive you for shooting that boy down?” Id., at 153a. Thompkins answered “Yes” and looked away. Ibid. Thompkins refused to make a written confession, and the interrogation ended about 15 minutes later. Id., at 11a.
Thompkins was charged with first-degree murder, assault with intent to commit murder, and certain firearms-related offenses. He moved to suppress the statements made during the interrogation. He argued that he had invoked his Fifth Amendment right to remain silent, requiring police to end the interrogation at once, see Michigan v. Mosley, 423 U. S. 96, 103 (1975) (citing Miranda, 384 U. S., at 474), that he had not waived his right to remain silent, and that his inculpatory statements were involuntary. The trial court denied the motion.
At trial, the prosecution’s theory was that Thompkins shot the victims from the passenger seat of a van driven by Eric Purifoy. Purifoy testified that he had been driving the van and that Thompkins was in the passenger seat while another man, one Myzell Woodward, was in the back. The defense strategy was to pin the blame on Purifoy. Purifoy testified he did not see who fired the weapon because the van was stopped and he was bending over near the floor when shots were fired. Purifoy explained that, just after the shooting, Thompkins, holding a pistol, told Purifoy, “What the hell you doing? Pull off.” Purifoy then drove away from the scene. App. 170a.
*377 So that the Thompkins jury could assess Purifoy’s credibility and knowledge, the prosecution elicited testimony from Purifoy that he had been tried earlier for the shooting under an aiding-and-abetting theory. Purifoy and Detective Hel-gert testified that a jury acquitted him of the murder and assault charges, convicted him of carrying a concealed weapon in a motor vehicle, and hung on two other firearms offenses to which he later pleaded guilty. At Purifoy’s trial, the prosecution had argued that Purifoy was the driver and Thompkins was the shooter. This was consistent with the prosecution’s argument at Thompkins’ trial.
After Purifoy’s trial had ended — but before Thompkins’ trial began — Purifoy sent Thompkins some letters. The letters expressed Purifoy’s disappointment that Thompkins’ family thought Purifoy was a “snitch” and a “rat.” Id., at 179a-180a. In one letter Purifoy offered to send a copy of his trial transcript to Thompkins as proof that Purifoy did not place the blame on Thompkins for the shooting. Id., at 180a. The letters also contained statements by Purifoy that claimed they were both innocent. Id., at 178a-179a. At Thompkins’ trial, the prosecution suggested that one of Purifoy’s letters appeared to give Thompkins a trial strategy. It was, the prosecution suggested, that Woodward shot the victims, allowing Purifoy and Thompkins to say they dropped to the floor when the shooting started. Id., at 187a-189a.
During closing arguments, the prosecution suggested that Purifoy lied when he testified that he did not see Thompkins shoot the victims:
“Did Eric Purifoy’s Jury make the right decision? I’m not here to judge that. You are not bound by what his Jury found. Take his testimony for what it was, [a] twisted attempt to help not just an acquaintance but his tight buddy.” Id., at 202a.
*378 Defense counsel did not object. Defense counsel also did not ask for an instruction informing the jury that it could consider evidence of the outcome of Purifoy’s trial only to assess Purifoy’s credibility, not to establish Thompkins’ guilt.
The jury found Thompkins guilty on all counts. He was sentenced to life in prison without parole.
B
The trial court denied a motion for new trial filed by Thompkins’ appellate counsel. The trial court rejected the claim of ineffective assistance of trial counsel for failure to ask for a limiting instruction regarding the outcome of Puri-foy’s trial, reasoning that this did not prejudice Thompkins. Id., at 236a.
Thompkins appealed this ruling, along with the trial court’s refusal to suppress his pretrial statements under Miranda. The Michigan Court of Appeals rejected the Miranda claim, ruling that Thompkins had not invoked his right to remain silent and had waived it. It also rejected the ineffective-assistance-of-counsel claim, finding that Thompkins failed to show that evidence of Purifoy’s conviction for firearms offenses resulted in prejudice. People v. Thompkins, No. 242478, (Feb. 3, 2004), App. to Pet. for Cert. 74a-82a. The Michigan Supreme Court denied discretionary review. 471 Mich. 866, 683 N. W. 2d 676 (2004) (table).
Thompkins filed a petition for a writ of habeas corpus in the United States District Court for the Eastern District of Michigan. The District Court rejected Thompkins’ Miranda and ineffective-assistance claims. App. to Pet. for Cert. 39a-72a. It noted that, under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court cannot grant a petition for a writ of habeas corpus unless the state court’s adjudication of the merits was “contrary to, or involved an unreasonable application of, clearly established Federal law.” 28 U. S. C. § 2254(d)(1). The District Court reasoned that Thompkins did not invoke his right to remain silent and was not coerced into making statements *379 during the interrogation. It held further that the Michigan Court of Appeals was not unreasonable in determining that Thompkins had waived his right to remain silent.
The United States Court of Appeals for the Sixth Circuit reversed, ruling for Thompkins on both his Miranda and ineffeetive-assistance-of-counsel claims. 547 F. 3d 572 (2008). The Court of Appeals ruled that the state court, in rejecting Thompkins’ Miranda claim, unreasonably applied clearly established federal law and based its decision on an unreasonable determination of the facts. See 28 U. S. C. § 2254(d). The Court of Appeals acknowledged that a waiver of the right to remain silent need not be express, as it can be “ ‘inferred from the actions and words of the person interrogated.’” 547 F. 3d, at 582 (quoting North Carolina v. Butler, 441 U. S. 369, 373 (1979)). The panel held, nevertheless, that the state court was unreasonable in finding an implied waiver in the circumstances here. The Court of Appeals found that the state eourt unreasonably determined the facts because “the evidence demonstrates that Thomp-kins was silent for two hours and forty-five minutes.” 547 F. 3d, at 586. According to the Court of Appeals, Thomp-kins’ “persistent silence for nearly three hours in response to questioning and repeated invitations to tell his side of the story offered a clear and unequivocal message to the officers: Thompkins did not wish to waive his rights.” Id., at 588.
The Court of Appeals next determined that the state court unreasonably applied clearly established federal law by rejecting Thompkins’ ineffective-assistance-of-eounsel claim based on counsel’s failure to ask for a limiting instruction regarding Purifoy’s acquittal. The Court of Appeals asserted that because Thompkins’ central strategy was to pin the blame on Purifoy, there was a reasonable probability that the result of Thompkins’ trial would have been different if there had been a limiting instruction regarding Purifoy’s acquittal.
We granted certiorari. 557 U. S. 965 (2009).
*380 II
Under AEDPA, a federal court may not grant a habeas corpus application “with respect to any claim that was adjudicated on the merits in State court proceedings,” 28 U. S. C. § 2254(d), unless the state court’s decision “was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States,” § 2254(d)(1), or “was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding,” § 2254(d)(2). See Knowles v. Mirzayance, 556 U. S. 111, 114 (2009). The relevant state-court decision here is the Michigan Court of Appeals’ decision affirming Thompkins’ conviction and rejecting his Miranda and ineffeetive-assistance-of-counsel claims on the merits.
III
The Miranda Court formulated a warning that must be given to suspects before they can be subjected to custodial interrogation. The substance of the warning still must be given to suspects today. A suspect in custody must be advised as follows:
“He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.” 384 U. S., at 479.
All concede that the warning given in this case was in full compliance with these requirements. The dispute centers on the response — or nonresponse — from the suspect.
A
Thompkins makes various arguments that his answers to questions from the detectives were inadmissible. He first *381 contends that he “invoke[d] his privilege” to remain silent by not saying anything for a sufficient period of time, so the interrogation should have “cease[d]” before he made his in-culpatory statements. Id., at 474; see Mosley, 423 U. S., at 103 (police must “‘scrupulously hono[r]’” this “critical safeguard” when the accused invokes his or her “ ‘right to cut off questioning’” (quoting Miranda, supra, at 474, 479)).
This argument is unpersuasive. In the context of invoking the Miranda right to counsel, the Court in Davis v. United States, 512 U. S. 452, 459 (1994), held that a suspect must do so “unambiguously.” If an accused makes a statement concerning the right to counsel “that is ambiguous or equivocal” or makes no statement, the police are not required to end the interrogation, ibid., or ask questions to clarify whether the accused wants to invoke his or her Miranda rights, 512 U. S., at 461-462.
The Court has not yet stated whether an invocation of the right to remain silent can be ambiguous or equivocal, but there is no principled reason to adopt different standards for determining when an accused has invoked the Miranda right to remain silent and the Miranda right to counsel at issue in Davis. See, e. g., Solem v. Stumes, 465 U. S. 638, 648 (1984) (“[M]uch of the logic and language of [Mosley],” which discussed the Miranda right to remain silent, “could be applied to the invocation of the [Miranda right to counsel]”). Both protect the privilege against compulsory self-incrimination, Miranda, supra, at 467-473, by requiring an interrogation to cease when either right is invoked, Mosley, supra, at 103 (citing Miranda, supra, at 474); Fare v. Michael C., 442 U. S. 707, 719 (1979).
There is good reason to require an accused who wants to invoke his or her right to remain silent to do so unambiguously. A requirement of an unambiguous invocation of Miranda rights results in an objective inquiry that “avoid[s] difficulties of proof and . . . provide[s] guidance to officers” on how to proceed in the face of ambiguity. Davis, 512 U. S., *382 at 458-459. If an ambiguous act, omission, or statement could require police to end the interrogation, police would be required to make difficult decisions about an accused’s unclear intent and face the consequence of suppression “if they guess wrong.” Id., at 461. Suppression of a voluntary confession in these circumstances would place a significant burden on society’s interest in prosecuting criminal activity. See id., at 459-461; Moran v. Burbine, 475 U. S. 412, 427 (1986). Treating an ambiguous or equivocal act, omission, or statement as an invocation of Miranda rights “might add marginally to Miranda’s goal of dispelling the compulsion inherent in custodial interrogation.” Burbine, 475 U. S., at 425. But “as Miranda holds, full comprehension of the rights to remain silent and request an attorney are sufficient to dispel whatever coercion is inherent in the interrogation process.” Id., at 427; see Davis, supra, at 460.
Thompkins did not say that he wanted to remain silent or that he did not want to talk with the police. Had he made either of these simple, unambiguous statements, he would have invoked his “'right to cut off questioning.’” Mosley, supra, at 103 (quoting Miranda, supra, at 474). Here he did neither, so he did not invoke his right to remain silent.
B
We next consider whether Thompkins waived his right to remain silent. Even absent the accused’s invocation of the right to remain silent, the accused’s statement during a custodial interrogation is inadmissible at trial unless the prosecution can establish that the accused “in fact knowingly and voluntarily waived [MirandaJ rights” when making the statement. Butler, 441 U. S., at 373. The waiver inquiry “has two distinct dimensions”: waiver must be “voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception,” and “made with a full awareness of both the nature of the right *383 being abandoned and the consequences of the decision to abandon it.” Burbine, supra, at 421.
Some language in Miranda could be read to indicate that waivers are difficult to establish absent an explicit written waiver or a formal, express oral statement. Miranda said “a valid waiver will not be presumed simply from the silence of the accused after warnings are given or simply from the fact that a confession was in fact eventually obtained.” 384 U. S., at 475; see id., at 470 (“No effective waiver . . . can be recognized unless specifically made after the [Miranda] warnings .. . have been given”). In addition, the Miranda Court stated that “a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel.” Id., at 475.
The course of decisions since Miranda, informed by the application of Miranda warnings in the whole course of law enforcement, demonstrates that waivers can be established even absent formal or express statements of waiver that would be expected in, say, a judicial hearing to determine if a guilty plea has been properly entered. Cf. Fed. Rule Crim. Proc. 11. The main purpose of Miranda is to ensure that an accused is advised of and understands the right to remain silent and the right to counsel. See Davis, supra, at 460; Burbine, supra, at 427. Thus, “[i]f anything, our subsequent cases have reduced the impact of the Miranda rule on legitimate law enforcement while reaffirming the decision’s core ruling that unwarned statements may not be used as evidence in the prosecution's case in chief.” Dickerson v. United States, 530 U. S. 428, 443-444 (2000).
One of the first cases to decide the meaning and import of Miranda with respect to the question of waiver was North Carolina v. Butler. The Butler Court, after discussing some of the problems created by the language in Miranda, established certain important propositions. Butler interpreted the Miranda language concerning the “heavy bur *384 den” to show waiver, 384 U. S., at 475, in accord with usual principles of determining waiver, which can include waiver implied from all the circumstances. See Butler, supra, at 373, 376. And in a later case, the Court stated that this “heavy burden” is not more than the burden to establish waiver by a preponderance of the evidence. Colorado v. Connelly, 479 U. S. 157, 168 (1986).
The prosecution therefore does not need to show that a waiver of Miranda rights was express. An “implicit waiver” of the “right to remain silent” is sufficient to admit a suspect’s statement into evidence. Butler, supra, at 376. Butler made clear that a waiver of Miranda rights may be implied through “the defendant’s silence, coupled with an understanding of his rights and a course of conduct indicating waiver.” 441 U. S., at 373. The Court in Butler therefore “retreated” from the “language and tenor of the Miranda opinion,” which “suggested that the Court would require that a waiver ... be ‘specifically made.’” Connecticut v. Barrett, 479 U. S. 523, 531-532 (1987) (Brennan, J., concurring in judgment).
If the State establishes that a Miranda warning was given and the accused made, an uncoerced statement, this showing, standing alone, is insufficient to demonstrate “a valid waiver” of Miranda rights. Miranda, supra, at 475. The prosecution must make the additional showing that the accused understood these rights. See Colorado v. Spring, 479 U. S. 564, 573-575 (1987); Barrett, supra, at 530; Burbine, 475 U. S., at 421-422. Cf. Tague v. Louisiana, 444 U. S. 469, 469, 471 (1980) (per curiam) (no evidence that accused understood his Miranda rights); Carnley v. Cochran, 369 U. S. 506, 516 (1962) (government could not show that accused “understandingly” waived his right to counsel in light of “silent record”). Where the prosecution shows that a Miranda warning was given and that it was understood by the accused, an accused’s uncoerced statement establishes an implied waiver of the right to remain silent.
*385 Although Miranda imposes on the police a rule that is both formalistic and practical when it prevents them from interrogating suspects without first providing them with a Miranda warning, see Burbine, 475 U. S., at 427, it does not impose a formalistic waiver procedure that a suspect must follow to relinquish those rights. As a general proposition, the law can presume that an individual who, with a full understanding of his or her rights, acts in a manner inconsistent with their exercise has made a deliberate choice to relinquish the protection those rights afford. See, e. g., Butler, supra, at 372-376; Connelly, supra, at 169-170 (“There is obviously no reason to require more in the way of a ‘volun-tariness’ inquiry in the Miranda waiver context than in the [due process] confession context”). The Court’s cases have recognized that a waiver of Miranda rights need only meet the standard of Johnson v. Zerbst, 304 U. S. 458, 464 (1938). See Butler, supra, at 374-375; Miranda, supra, at 475-476 (applying Zerbst standard of intentional relinquishment of a known right). As Butler recognized, 441 U. S., at 375-376, Miranda rights can therefore be waived through means less formal than a typical waiver on the record in a courtroom, cf. Fed. Rule Crim. Proc. 11, given the practical constraints and necessities of interrogation and the fact that Miranda’s main protection lies in advising defendants of their rights, see Davis, 512 U. S., at 460; Burbine, 475 U. S., at 427.
The record in this case shows that Thompkins waived his right to remain silent. There is no basis in this case to conclude that he did not understand his rights; and on these facts it follows that, he chose not to invoke or rely on those rights when he did speak. First, there is no contention that Thompkins did not understand his rights; and from this it follows that he knew what he gave up when he spoke. See id., at 421. There was more than enough evidence in the record to conclude that Thompkins understood his Miranda rights. Thompkins received a written copy of the Miranda warnings; Detective Helgert determined that Thompkins *386 could read and understand English; and Thompkins was given time to read the warnings. Thompkins, furthermore, read aloud the fifth warning, which stated that “you have the right to deeide at any time before or during questioning to use your right to remain silent and your right to talk with a lawyer while you are being questioned.” Brief for Petitioner 60 (capitalization omitted). He was thus aware that his right to remain silent would not dissipate after a certain amount of time and that police would have to honor his right to be silent and his right to counsel during the whole course of interrogation. Those rights, the warning made clear, could be asserted at any time. Helgert, moreover, read the warnings aloud.
Second, Thompkins’ answer to Detective Helgert’s question about whether Thompkins prayed to God for forgiveness for shooting the victim is a “course of conduct indicating waiver” of the right to remain silent. Butler, supra, at 373. If Thompkins wanted to remain silent, he could have said nothing in response to Helgert’s questions, or he could have unambiguously invoked his Miranda rights and ended the interrogation. The fact that Thompkins made a statement about three hours after receiving a Miranda warning does not overcome the fact that he engaged in a course of conduct indicating waiver. Police are not required to rewarn suspects from time to time. Thompkins’ answer to Helgert’s question about praying to God for forgiveness for shooting the victim was sufficient to show a course of conduct indicating waiver. This is confirmed by the fact that before then Thompkins had given sporadic answers to questions throughout the interrogation.
Third, there is no evidence that Thompkins’ statement was coerced. See Burbine, supra, at 421. Thompkins does not claim that police threatened or injured him during the interrogation or that he was in any way fearful. The interrogation was conducted in a standard-sized room in the middle of the afternoon. It is true that apparently he was in a *387 straight-backed chair for three hours, but there is no authority for the proposition that an interrogation of this length is inherently coercive. Indeed, even where interrogations of greater duration were held to be improper, they were accompanied, as this one was not, by other facts indicating coercion, such as an incapacitated and sedated suspect, sleep and food deprivation, and threats. Cf. Connelly, 479 U. S., at 163-164, n. 1. The fact that Helgert’s question referred to Thompkins’ religious beliefs also did not render Thompkins’ statement involuntary. “[T]he Fifth Amendment privilege is not concerned ‘with moral and psychological pressures to confess emanating from sources other than official coercion.’ ” Id., at 170 (quoting Oregon v. Elstoud, 470 U. S. 298, 305 (1985)). In these circumstances, Thompkins knowingly and voluntarily made a statement to police, so he waived his right to remain silent.
C
Thompkins next argues that, even if his answer to Detective Helgert could constitute a waiver of his right to remain silent, the police were not allowed to question him until they obtained a waiver first. Butler forecloses this argument. The Butler Court held that courts can infer a waiver of Miranda rights “from the actions and words of the person interrogated.” 441 U. S., at 373. This principle would be inconsistent with a rule that requires a waiver at the outset. The Butler Court thus rejected the rule proposed by the Butler dissent, which would have “requir[ed] the police to obtain an express waiver of [Miranda rights] before proceeding with interrogation.” Id., at 379 (Brennan, J., dissenting). This holding also makes sense given that “the primary protection afforded suspects subject[ed] to custodial interrogation is the Miranda warnings themselves.” Davis, supra, at 460. The Miranda rule and its requirements are met if a suspect receives adequate Miranda warnings, understands them, and has an opportunity to invoke the rights before giving any answers or admissions. Any waiver, express or implied, *388 may be contradicted by an invocation at any time. If the right to counsel or the right to remain silent is invoked at any point during questioning, further interrogation must cease.
Interrogation provides the suspect with additional information that can put his or her decision to waive, or not to invoke, into perspective. As questioning commences and then continues, the suspect has the opportunity to consider the choices he or she faces and to make a more informed decision, either to insist on silence or to cooperate. When the suspect knows that Miranda rights can be invoked at any time, he or she has the opportunity to reassess his or her immediate and long-term interests. Cooperation with the police may result in more favorable treatment for the suspect; the apprehension of accomplices; the prevention of continuing injury and fear; beginning steps toward relief or solace for the victims; and the beginning of the suspect’s own return to the law and the social order it seeks to protect.
In order for an accused’s statement to be admissible at trial, police must have given the accused a Miranda warning. See Miranda, 384 U. S., at 471. If that condition is established, the court can proceed to consider whether there has been an express or implied waiver of Miranda rights. Id., at 476. In making its ruling on the admissibility of a statement made during custodial questioning, the trial court, of course, considers whether there is evidence to support the conclusion that, from the whole course of questioning, an express or implied waiver has been established. Thus, after giving a Miranda warning, police may interrogate a suspect who has neither invoked nor waived his or her Miranda rights. On these premises, it follows the police were not required to obtain a waiver of Thompkins’ Miranda rights before commencing the interrogation.
D
In sum, a suspeet who has received and understood the Miranda warnings, and has not invoked his Miranda rights, *389 waives the right to remain silent by making an uncoerced statement to the police. Thompkins did not invoke his right to remain silent and stop the questioning. Understanding his rights in full, he waived his right to remain silent by making a voluntary statement to the police. The police, moreover, were not required to obtain a waiver of Thomp-kins’ right to remain silent before interrogating him. The state court’s decision rejecting Thompkins’ Miranda claim was thus correct under de novo review and therefore necessarily reasonable under the more deferential AEDPA standard of review, 28 U. S. C. § 2254(d). See Knowles, 556 U. S., at 123-124 (state court’s decision was correct under de novo review and not unreasonable under AEDPA).
IV
The second issue in this case is whether Thompkins’ counsel provided ineffective assistance by failing to request a limiting instruction regarding how the jury could consider the outcome of Purifoy’s trial. To establish ineffective assistance of counsel, a defendant “must show both deficient performance by counsel and prejudice.” Id., at 122 (citing Strickland, 466 U. S., at 687). To establish prejudice, a “defendant must show that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different.” Strickland, 466 U. S., at 694. In assessing prejudice, courts “must consider the totality of the evidence before the judge or jury.” Id., at 695. The Court of Appeals, however, neglected to take into account the other evidence presented against Thompkins.
The Court of Appeals determined that the state court was unreasonable, 28 U. S. C. § 2254(d), when it found that Thomp-kins suffered no prejudice from failure of defense counsel to request an instruction regarding Purifoy’s earlier acquittal of the murder and assault charges. The state court had rejected Thompkins’ claim that he was prejudiced by evidence of Purifoy’s earlier conviction for firearms offenses, noting that “the record does not disclose an attempt to argue *390 that conviction for an improper purpose.” App. to Pet. for Cert. 80a. It is unclear what prejudice standard the state court applied. The Court of Appeals ruled that the state court used the incorrect standard for assessing prejudice under Strickland because “[questions of the prosecution’s purpose or intent are completely irrelevant in ... analyzing whether an error resulted in prejudice, which by definition concerns the error’s effect upon the outcome.” 547 F. 3d, at 591-592 (emphasis deleted).
Even if the state court used an incorrect legal standard, we need not determine whether AEDPA's deferential standard of review, 28 U. S. C. § 2254(d), applies in this situation. Cf. Williams v. Taylor, 529 U. S. 362, 397-398 (2000). That is because, even if AEDPA deference does not apply, Thomp-kins cannot show prejudice under de novo review, the more favorable standard of review for Thompkins. Courts cannot grant writs of habeas corpus under § 2254 by engaging only in de novo review when it is unclear whether AEDPA deference applies, § 2254(d). In those situations, courts must resolve whether AEDPA deference applies, because if it does, a habeas petitioner may not be entitled to a writ of habeas corpus under § 2254(d). Courts can, however, deny writs of habeas corpus under §2254 by engaging in de novo review when it is unclear whether AEDPA deference applies, because a habeas petitioner will not be entitled to a writ of habeas corpus if his or her claim is rejected on de novo review, see § 2254(a).
It seems doubtful that failure to request the instruction about the earlier acquittal or conviction was deficient representation; but on the assumption that it was, on this record Thompkins cannot show prejudice. The record establishes that it was not reasonably likely that the instruction would have made any difference in light of all the other evidence of guilt. The surviving victim, Frederick France, identified Thompkins as the shooter, and the identification was supported by a photograph taken from a surveillance camera. *391 Thompkins’ friend Omar Stephens testified that Thompkins confessed to him during a phone conversation, and the details of that confession were corroborated by evidence that Thompkins stripped the van and abandoned it after the shooting. The jury, moreover, was capable of assessing Puri-foy’s credibility, as it was instructed to do. The jury in Thompkins’ case could have concluded that the earlier jury in Purifoy’s case made a mistake, or alternatively, that Puri-foy was not in fact guilty of the crime for which he had been charged. There was ample evidence in the record to support Thompkins’ guilt under either theory, and his jury was instructed to weigh all of the evidence in determining whether there was guilt beyond a reasonable doubt. Under our de novo review of this record, Thompkins cannot show prejudice.
* * *
The judgment of the Court of Appeals is reversed, and the case is remanded with instructions to deny the petition.

It is so ordered.